UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 96-12(L)
(CA-84-2135-6-2AK, CA-84-2792-6-2AK)

Larry Gilbert,

Petitioner - Appellee,

versus

Michael W. Moore, etc., et al,

Respondents - Appellants.

O R D E R

The Court further amends its opinion filed January 22, 1998, and amended February 10, 1998, as follows:

On page 4, footnote 2, line 5 -- the phrase "§ 106 of" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

Filed:  February 10, 1998

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 96-12(L)
(CA-84-2135-6-2AK, CA-84-2792-6-2AK)

Larry Gilbert,

Petitioner - Appellee,

versus

Michael W. Moore, etc., et al,

Respondents - Appellants.

O R D E R

The Court amends its opinion filed January 22, 1998, as follows:

On page 25, footnote 14, line 2 -- the citation to <u>Barnes v. Thompson</u> is corrected to read "58 F.3d 971, <u>974</u> n.2."

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LARRY GILBERT,
Petitioner-Appellee,

v.

MICHAEL W. MOORE, Director of the
South Carolina Department of

Corrections, in his official capacity;
CHARLES M. CONDON, Attorney
General of the State of South
Carolina,
Respondents-Appellants.

           No. 96-12

J. D. GLEATON,
Petitioner-Appellee,

v.

MICHAEL W. MOORE, Director of the
South Carolina Department of

Corrections, in his official capacity;
CHARLES M. CONDON, Attorney
General of the State of South
Carolina,
Respondents-Appellants.

           No. 96-13

LARRY GILBERT,
Petitioner-Appellant,

v.

MICHAEL W. MOORE, Director of the
South Carolina Department of

No. 96-15

Corrections, in his official capacity;
CHARLES M. CONDON, Attorney
General of the State of South
Carolina,
Respondents-Appellees.

J. D. GLEATON,
Petitioner-Appellant,

v.

MICHAEL W. MOORE, Director of the
South Carolina Department of

No. 96-16

Corrections, in his official capacity;
CHARLES M. CONDON, Attorney
General of the State of South
Carolina,
Respondents-Appellees.

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
C. Weston Houck, Chief District Judge.
(CA-84-2135-6-2AK, CA-84-2792-6-2AK)

Argued: December 2, 1997

Decided: January 22, 1998

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

2

Nos. 96-12 and 96-13 reversed, and Nos. 96-15 and 96-16 affirmed, by published opinion. Judge Wilkins wrote the majority opinion, in which Chief Judge Wilkinson and Judges Widener, Murnaghan, Ervin, Niemeyer, Luttig, and Williams joined. Judge Hamilton joined in the majority opinion except Parts VI A and VI B and wrote an opinion concurring in part and concurring in the judgment. Judge Michael and Judge Motz joined in the majority opinion except Part VI and each wrote an opinion concurring in part and concurring in the judgment.

---

## COUNSEL

**ARGUED:** Charles Molony Condon, Attorney General, Columbia, South Carolina, for Appellants. John Henry Blume, III, Columbia, South Carolina, for Appellees. **ON BRIEF:** John W. McIntosh, Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Robert F. Daley, Jr., Assistant Attorney General, Columbia, South Carolina, for Appellants. Vance L. Cowden, William Lewis Burke, Jr., Department of Clinical Legal Studies, UNIVERSITY OF SOUTH CAROLINA SCHOOL OF LAW, Columbia, South Carolina, for Appellee Gilbert; David P. Voisin, Hilary Sheard, CENTER FOR CAPITAL LITIGATION, Columbia, South Carolina, for Appellee Gleaton.

---

## OPINION

WILKINS, Circuit Judge:

Half brothers Larry Gilbert and J. D. Gleaton (collectively, "Petitioners") filed petitions for habeas corpus relief[1] from their South Car-

---

[1] Petitioners named James Aiken, Warden of Central Correctional Institution where they were then incarcerated, and the South Carolina Attorney General as Respondents in their petitions. Subsequently, Michael W. Moore, Director of the South Carolina Department of Corrections, was substituted for Aiken. For ease of reference, we refer to Respondents collectively as "the State" throughout this opinion.

3

olina capital murder convictions and resulting death sentences. <u>See</u> 28 U.S.C.A. § 2254 (West 1994).**2** The district court granted the relief sought, holding that the state trial court committed harmful error in instructing the jurors that the element of malice necessary to prove murder under South Carolina law was presumed from the intentional doing of an unlawful act without just cause or excuse and from the use of a deadly weapon. The district court determined, however, that relief was not warranted on the basis of any of the other grounds advanced by Petitioners. The State appealed the decision of the district court to grant the writs on the basis of the unconstitutional burden-shifting instruction. Petitioners cross appealed the refusal of the district court to find that relief was warranted with respect to other issues. A panel of this court affirmed the decision of the district court. <u>See Gilbert v. Moore</u>, 121 F.3d 144 (4th Cir. 1997). Thereafter, a majority of the judges in active service voted to rehear these appeals en banc. We now conclude that the unconstitutional burden-shifting instruction was harmless error and that none of the remaining claims pressed by Petitioners provide a basis for habeas relief.

I.

On July 17, 1977, Ralph Stoudemire was working alone in his South Congaree, South Carolina service station. High on illegal drugs, Petitioners entered the station, shot and stabbed Stoudemire, and committed robbery. Stoudemire died a short time later. Petitioners subsequently were convicted of capital murder and sentenced to death. The South Carolina Supreme Court affirmed Petitioners' convictions, but vacated their sentences and remanded for resentencing. <u>See State v.</u>

_____

**2** Because Gilbert's and Gleaton's petitions for writs of habeas corpus were filed in 1984, prior to the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, amendments to 28 U.S.C.A. § 2254 effected by the AEDPA do not govern our resolution of this appeal. <u>See</u> <u>Lindh v. Murphy</u>, 117 S. Ct. 2059, 2067 (1997). And, the provisions of § 107 of the AEDPA do not apply because Petitioners' state habeas petitions were finally decided by the South Carolina Supreme Court before June 18, 1996, the date South Carolina purports to have adopted procedures adequate to satisfy the opt-in provisions of§ 107. <u>See Howard v.</u> <u>Moore</u>, 131 F.3d 399, ___ n.1 (4th Cir. 1997) (en banc).

4

Gilbert, 258 S.E.2d 890, 894 (S.C. 1979). On remand, a second jury sentenced Petitioners to death. The South Carolina Supreme Court affirmed the sentences, and the United States Supreme Court denied certiorari. See State v. Gilbert, 283 S.E.2d 179, 182 (S.C. 1981), cert. denied, 456 U.S. 984 (1982). Thereafter, Petitioners sought post-conviction relief (PCR) from their convictions and sentences in state court. The state PCR court denied relief. The South Carolina Supreme Court and the United States Supreme Court denied certiorari.

In late 1984, Petitioners filed § 2254 petitions in the district court. In May 1985, a magistrate judge recommended granting the State's motion for summary judgment as to all claims. In June 1988, the district court initially adopted the recommendation of the magistrate judge, granting summary judgment to the State and dismissing the petitions. Petitioners timely filed motions seeking to have the court vacate or reconsider its judgment and to permit them to amend their petitions. In August 1991, the district court vacated its earlier order, granted Petitioners' motions to amend their petitions, and remanded the proceedings to the magistrate judge with instructions to hold the matters in abeyance for 60 days to permit Petitioners to pursue additional state-court remedies.

Petitioners then returned to state court, filing second PCR petitions. The state court initially dismissed as successive all except two of the grounds because they had been, or should have been, raised in the first PCR actions, and it conducted an evidentiary hearing with respect to the two remaining claims--Petitioners' assertion that the trial court committed reversible error by instructing the jury that malice is presumed from the intentional doing of an unlawful act without just cause or excuse and from the use of a deadly weapon, see Yates v. Evatt, 500 U.S. 391, 397 (1991), and their claim that the State deprived them of their Sixth Amendment right to a jury composed of a fair cross section of the community by systematically removing black prospective jurors from the venire, see Swain v. Alabama, 380 U.S. 202, 222-28 (1965). The state PCR court concluded that these claims provided no basis for relief, ruling in pertinent part that the challenged jury instruction was unconstitutional but harmless and that the Swain claim was successive. The South Carolina Supreme Court denied certiorari. While these proceedings were pending in July 1992, the district court granted the State's motion to expedite the federal

5

proceedings and to waive exhaustion as to the remaining issues pend-ing in state court.

On August 26, 1996, the district court held that Petitioners were entitled to habeas relief.**3** The court ruled that the challenged jury charge constituted a mandatory presumption that shifted the burden of proof on the issue of malice from the prosecution to Petitioners in violation of the Fourteenth Amendment and that the error was not harmless. The court determined, however, that the remaining grounds for relief pressed by Petitioners lacked merit.

II.

Petitioners' principal claim is that an instruction to the jurors dur-ing the guilt phase of their capital trial shifted the burden of proof on the element of malice from the prosecution to them in violation of the Due Process Clause of the Fourteenth Amendment, which requires that the State prove each element of a charged offense beyond a rea-sonable doubt. See Yates v. Evatt, 500 U.S. 391, 400-01 (1991). We conclude that although the challenged instruction is unconstitutional, the error was harmless.

Under South Carolina law, "`[m]urder' is the killing of any person with malice aforethought, either express or implied." S.C. Code Ann. § 16-3-10 (Law. Co-op. 1985) (emphasis omitted). And, malice is a "wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." State v. Johnson, 352 S.E.2d 480, 481 (S.C. 1987) (per curiam); see also State v. Glenn, 492 S.E.2d 393, 398 (S.C. Ct. App. 1997) ("Malice is the doing of a wrongful act inten-tionally and without just cause or excuse."). Although an unjustified or inexcusable specific intent to kill constitutes malice, a specific intent to kill is not required. See State v. Foust, 479 S.E.2d 50, 51 & n.2 (S.C. 1996).

> In its popular sense, the term "malice" conveys the meaning
> of hatred, ill-will, or hostility toward another. In its legal
> sense, however, as it is employed in the description of mur-

_____

**3** The Judicial Council of the Fourth Circuit subsequently adopted time limitations for future cases.

der, it does not of necessity import ill-will toward the individual injured, but signifies rather a general malignant recklessness of the lives and safety of others, or a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief; in other words, a malicious killing is where the act is done without legal justification, excuse, or extenuation, and malice has been frequently substantially so defined as consisting of the intentional doing of a wrongful act toward another without legal justification or excuse.

State v. Heyward, 15 S.E.2d 669, 671 (S.C. 1941) (internal quotation marks omitted).

Before the jury retired to deliberate Petitioners' guilt, the trial court gave the jury what was at the time a standard instruction on the element of malice, charging that "malice is implied or presumed from the willful, deliberate and intentional doing of an unlawful act without just cause or excuse" and from the use of a deadly weapon. J.A. 2275-76. Although the trial court also instructed the jurors that the presumption of malice was rebuttable and that they were to decide based upon all of the evidence presented whether malice had been established beyond a reasonable doubt, Petitioners maintain that the instruction on presumed malice impermissibly shifted the burden of proof from the State to them on this issue. See Yates, 500 U.S. at 400-02; Francis v. Franklin, 471 U.S. 307, 315-18 (1985); Sandstrom v. Montana, 442 U.S. 510, 524 (1979). The State concedes that the presumed malice instruction amounted to an error of constitutional magnitude. And, although we are not bound by the State's concession, see Sibron v. New York, 392 U.S. 40, 58 (1968), we agree that the challenged instruction constituted an unconstitutional burden-shifting instruction, see Hyman v. Aiken, 824 F.2d 1405, 1409 (4th Cir. 1987). The dispositive issue with respect to this claim, then, is whether the error occasioned by the unconstitutional instruction was harmless.

It is now well established that not all errors of constitutional dimension warrant a federal court to overturn a state conviction or sentence. See Chapman v. California, 386 U.S. 18, 23-24 (1967); Sherman v. Smith, 89 F.3d 1134, 1137 (4th Cir. 1996) (en banc), cert. denied, 117 S. Ct. 765 (1997); Smith v. Dixon, 14 F.3d 956, 974-75

7

(4th Cir. 1994) (en banc). Although federal habeas courts play an important role in protecting the constitutional rights of state criminal defendants, that role is circumscribed and secondary to that of state courts. See Brecht v. Abrahamson, 507 U.S. 619, 633 (1993). Once the principal avenue for review of a state criminal conviction and sentence--direct review--has been completed, "`a presumption of finality and legality attaches to the conviction and sentence.'" Id. (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983)). Respect for the finality of a presumptively valid state-court conviction and sentence dictates that a federal court may not grant habeas corpus relief on the basis of trial error of constitutional dimension unless the court is convinced that "the error `had substantial and injurious effect or influence in determining the ... verdict,'" id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)), or at a minimum entertains grave doubt that it had such an effect, see O'Neal v. McAninch, 513 U.S. 432, 437 (1995) (holding that when "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judge must resolve that doubt in favor of the habeas petitioner).**4**

In applying this standard, a federal habeas court does not ask whether the evidence of guilt was sufficient, whether the jury would have reached the same conclusion if the error had not occurred, or whether the jury reached the correct result based on the evidence presented. See Satcher v. Pruett, 126 F.3d 561, 567-68 (4th Cir.), cert. denied, 118 S. Ct. 595 (1997). Rather, the court reviews the record de novo to determine whether the error "substantially sway[ed] or substantially influence[d] the response" of the jury to the question put to it--i.e., in the guilt context, whether the defendant is guilty or not guilty. Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc),

---

**4** The Brecht Court left open the possibility that under unusual circumstances "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." Brecht, 507 U.S. at 638 n.9. Petitioners' claim that their trial was tainted by an unconstitutional burden-shifting instruction is not such a claim. See Yates, 500 U.S. at 407-11 (conducting analysis of whether burden-shifting instruction was prejudicial).

cert. denied, 118 S. Ct. 83 (1997); see O'Neal, 513 U.S. at 436 (explaining that in making the harmlessness determination, a federal habeas judge must review the record to assess whether "the judge[ ] think[s] that the error substantially influenced the jury's decision" (internal quotation marks omitted)); Brecht, 507 U.S. at 637 (holding that an error does not have a substantial and injurious effect on a jury verdict unless "it resulted in `actual prejudice'" to the habeas petitioner (quoting United States v. Lane, 474 U.S. 438, 449 (1986))); cf. Yates, 500 U.S. at 405 (holding that harmless-error analysis of an unconstitutional burden-shifting instruction "requires an identification and evaluation of the evidence considered by the jury in addition to the presumption itself"). The distinction between the type of harmless-error review necessary on direct review compared to that applicable in habeas review is especially well defined in the context of an improper jury charge. The Supreme Court has instructed that in assessing whether an improper jury instruction had a substantial and injurious effect on the verdict, a court need not conclude that "`the facts found by the jury establish[ ] that the jury necessarily found'" the element on which the improper instruction was given as would be required on direct review. California v. Roy, 117 S. Ct. 337, 338 (1996) (per curiam) (quoting Roy v. Gomez, 81 F.3d 863, 867 (9th Cir. 1996)); see United States v. Hastings, No. 94-5670, 1998 WL 9511, at *5 (4th Cir. Jan. 14, 1998) (explaining that on direct review of a properly objected to jury instruction, to determine whether erroneous instruction was harmless, a court must "ascertain[ ] what evidence the jury necessarily credited in order to convict under the erroneous instruction and then consider[ ] whether that evidence--or facts so inextricably intertwined with the credited evidence that acceptance of the evidence is the functional equivalent of finding those facts--establishes an offense under a proper instruction").

Our review of the record from Petitioners' trial leaves no doubt that the burden-shifting instruction on presumed malice had no substantial or injurious effect on the verdicts. Confessions by both men were introduced into evidence. Gilbert's confession indicated that he initially remained outside the store while Gleaton went inside. Gilbert stated:

> [Stoudemire] reached into his pocket and I ran into the station and shot the man one time with a .22 caliber pistol.

> Then I tried to get in the cash register, but it was locked, so
> I picked up a lady's pocketbook and ran outside the door ....

J.A. 1830. Gleaton's confession provided a more detailed picture of events. He stated that he and Gilbert decided to rob the victim after passing the store in their automobile and noticing that Stoudemire was alone:

> I went in and asked the man how much his cigarettes were
> and he told me and I said I could get them cheaper some-
> where else. [Gilbert] came in the door so we could rob the
> man. We decided to rob the man after we had passed by and
> saw he was by himself. I was fixing to pay the man for the
> cigarettes when [Gilbert] pulled the gun. The man said
> something and hit me and we started to scuffle. I pulled the
> knife out and stabbed him and [Gilbert] came up and shot.
> I stabbed the man more than one time. I ran out the door and
> didn't look for any money. Larry Gilbert stayed inside for
> a few minutes and came out. He said the cash register was
> locked.

J.A. 2009-10. Indeed, Gleaton did stab Stoudemire "more than one time"--seven times in fact.

The pathologist who performed the autopsy of Stoudemire testified without contradiction concerning the nature of the wounds inflicted, providing a graphic picture of the attack. The pathologist described five stab wounds to different areas of Stoudemire's chest and two defensive slash wounds to his left arm. The two defensive slash wounds were delivered with such force that the first was stopped only by the bone in Stoudemire's arm and the second actually cut into his wrist joint. The stab wounds to Stoudemire's chest were delivered with similar or greater force. For example, one of the wounds indicated that Gleaton's knife entered Stoudemire's body at the center of his chest and left "a fairly large gaping wound that simply cut the skin open. [The knife] was stopped by the bones of the chest." J.A. 1419. Another injury was described as "a stab wound that came in just toward the midline from the left nipple, went under the skin and stopped right at this boney notch at the base of[the] neck." Id. Other injuries were inflicted by Gleaton's knife slicing into Stoudemire's

10

liver and intestines. Yet another wound resulted when Gleaton's knife "went in under the arm just behind th[e] pectoralis muscles. It went through and actually cut, with a very clean slice, the third rib, went into the chest cavity and through the left side of the heart." Id. This wound was delivered with sufficient force to cleanly sever Stoudemire's rib. The pathologist also testified that Stoudemire had suffered a gunshot wound to the chest.

The savagery of the attack as evidenced by the number and character of the injuries inflicted leaves no uncertainty concerning whether Gilbert and Gleaton intended to injure Stoudemire.[5] See Cooper, 103 F.3d at 370 (explaining that overwhelming impact of evidence may render an error harmless); Correll v. Thompson, 63 F.3d 1279, 1291 (4th Cir. 1995) (holding that admission of confession, if error, was harmless because the evidence against the defendant was overwhelming). Gilbert never maintained that he accidentally shot Stoudemire, and it is evident from his confession that he did so intentionally. Similarly, Gleaton at no time asserted that he accidentally stabbed Stoudemire during a "scuffle."[6] Rather, Gleaton stated that he removed his knife from his pocket after the "scuffle" with Stoudemire began. This admittedly intentional act of removing his knife after the

_____

[5] The state trial court charged the jury in accordance with South Carolina law "that if a crime is committed by two or more persons who are acting together in the commission of an offense, the act of one is the act of both or all .... [A]s it is sometimes said, the hand of one is the hand of all." J.A. 2283; see Yates v. Aiken, 349 S.E.2d 84, 87 (S.C. 1986), rev'd on other grounds, 484 U.S. 211 (1988); State v. Hicks, 185 S.E.2d 746, 748 (S.C. 1971). Thus, if the jury concluded that Gleaton's fatal stabbing of Stoudemire was committed with malice, and that Gilbert and Gleaton were acting together, the jury could have found Gilbert guilty of the murder as a principal.

[6] The defense theory during the guilt phase of the trial focused on the voluntariness of Petitioners' confessions. Petitioners maintained that their confessions had been rendered involuntarily and that without the confessions the evidence presented by the State was inadequate to prove their guilt beyond a reasonable doubt. Defense counsel never asserted that Stoudemire's death resulted from an accident or was justified and did not request that the trial court charge the jury on self-defense or involuntary manslaughter. Furthermore, Petitioners have never contended that defense counsel was ineffective for failing to do so.

11

fray commenced negates any suggestion that Gleaton may have accidentally stabbed Stoudemire. Moreover, the number of stab wounds inflicted by Gleaton and the brutality with which they were delivered overwhelmingly demonstrates malice on Gleaton's part. Indeed, no rational juror could conclude that such wounds were inflicted by accident. Cf. Tucker v. Kemp, 762 F.2d 1496, 1502-03 (11th Cir. 1985) (en banc) (holding burden-shifting instruction harmless because single crushing blow delivered to victim's skull was not the type that happens by chance). Furthermore, because they were engaged in an armed robbery, neither Gilbert nor Gleaton possessed any legal justification for an intentional attack on Stoudemire. See State v. Brown, 467 S.E.2d 922, 924 (S.C. 1996) (per curiam) (holding that "[u]nder the law of self-defense, one who is attacked on his own premises is immune from the duty to retreat," but "a lawful guest has a duty to retreat when attacked by the owner"); see also State v. Ivey, 481 S.E.2d 125, 127 (S.C. 1997) (noting that "[t]he exercise of a legal right ... is never in law deemed a provocation sufficient to justify or mitigate an act of violence"). Considering the totality of the overpowering evidence of malice that the jury had before it, there can be no doubt that the erroneous instruction had no effect whatsoever on the verdicts, much less a substantial and injurious one. Compare Plath v. Moore, 130 F.3d 595, 598-99 (4th Cir. 1997) (holding unconstitutional burden-shifting instruction harmless in light of overwhelming evidence of malice), Arnold v. Evatt, 113 F.3d 1352, 1356-57 (4th Cir. 1997) (same), cert. denied, 66 U.S.L.W. 3456 (U.S. Jan. 12, 1998) (No. 97-6646), Cunningham v. Zant, 928 F.2d 1006, 1014-15 (11th Cir. 1991) (holding that a burden-shifting instruction on intent was harmless when defendant struck victim approximately eight times on the head with a wrench and victim suffered additional extensive defensive wounds), Dickey v. Lewis, 859 F.2d 1365, 1370-76 (9th Cir. 1988) (holding instruction that intent to kill is presumed from the use of a deadly weapon was harmless because defendant's act of shooting victim at point-blank range and then blocking attempts to assist him provided overwhelming evidence of intent), Williams v. Kemp, 846 F.2d 1276, 1284 (11th Cir. 1988) (holding that an instruction that shifted the burden on intent was harmless when "victim died as a result of ten crushing blows to the skull with a blunt object and smoke inhalation from a fire that was intentionally ignited"), House v. Lavoie, 843 F.2d 474, 475-76 (11th Cir. 1988) (per curiam) (conclud-

12

ing that any error in allegedly unconstitutional burden-shifting instruction on intent was harmless because defendant admitted he intended to shoot victim five times but claimed that he acted in self-defense), Tucker, 762 F.2d at 1502-03 (holding burden-shifting instruction harmless because crushing blow delivered to victim's skull was not the type of injury that occurs by accident), and Lamb v. Jernigan, 683 F.2d 1332, 1342-43 (11th Cir. 1982) (concluding that because no reasonable juror could have found that the defendant's intentional stabbing of 72-year-old victim 11 times, when at least three of the wounds were immediately disabling, was self-defense or provoked, burden-shifting instruction was harmless), with Houston v. Dutton, 50 F.3d 381, 383, 386-87 (6th Cir. 1995) (holding unconstitutional burden-shifting instruction on presumed malice was not harmless because it essentially prevented jury from considering defendant's lone argument that the murder, produced by three gunshot wounds, was accidental), Hernandez v. Rayl, 944 F.2d 794, 796-97 (10th Cir. 1991) (concluding that a burden-shifting instruction on intent was not harmless because the evidence presented against defendant was not so strong that the court could say that the jury found intent established independently of the unconstitutional instruction), and Hyman v. Aiken, 824 F.2d 1405, 1409-10 (4th Cir. 1987) (holding an unconstitutional burden-shifting instruction was not harmless where uncontradicted evidence established defendant's intoxication at the time of the murder, the trial court instructed the jury to consider defendant's intoxication in determining whether he could have formed the intent necessary to be guilty of murder, but then effectively removed the intoxication defense from the consideration of the jury by instructing that intent was to be presumed from the doing of an unlawful act).

Petitioners contend, however, that the decision of the Supreme Court in Yates dictates a determination in their favor, arguing that Yates is factually indistinguishable from this case and thus requires a similar result. To the contrary, the differences between the evidence presented in Petitioners' trial and that considered in Yates are significant and serve only to highlight why the burden-shifting instruction is harmless error here. See Yates, 500 U.S. at 409-11. In Yates, the evidence demonstrated that during an armed robbery of a store, Yates' coconspirator, Davis, who was armed with a knife, was chasing the store owner, Wood, who was armed with a firearm. Wood's

mother observed the altercation and ran into the fray, grabbing Davis. During the ensuing scuffle, Davis stabbed Mrs. Wood once, killing her. The Supreme Court concluded that the evidence of Davis' intent toward Mrs. Wood was unclear. Although the evidence could support an inference that Davis intended to kill all witnesses to the crime to avoid detection, this inference "was not compelled as a rational necessity." Id. at 410. Further, the Court opined that the circumstances of Mrs. Wood's death did not "reveal anything clear about Davis' intent toward her." Id. In particular, the Court focused on two facts, that Mrs. Wood was stabbed only once and that the wound was inflicted during the struggle. See id. at 411. Thus, the Court reasoned, "She could have been killed inadvertently by Davis, and we cannot rule out that possibility beyond a reasonable doubt." Id.

This case is factually very different. The evidence presented in Gilbert and Gleaton's trial clearly rules out any possibility that Stoudemire's death was "inadvertent." Instead, the evidence permits no other conclusion than that Gilbert and Gleaton intentionally inflicted numerous and serious injuries on Stoudemire without just cause or excuse. Although there is one relevant similarity between the evidence presented in Yates and that presented in Petitioners' trial-- in both instances the victim was still alive when the perpetrators left the scene--this one similarity is insignificant in light of the sharp contrast in the remaining evidence: The evidence in Yates left open a reasonable possibility that the fatal wound may have been inflicted accidentally, but here the evidence leaves open no such possibility.

Finally, it bears noting that in Yates the Supreme Court reviewed the unconstitutional burden-shifting instruction to determine whether the error was harmless beyond a reasonable doubt. See id. Subsequently, however, the Court expressly disavowed the application of the beyond-a-reasonable-doubt standard adopted in Chapman v. California, 386 U.S. 18 (1967), to analyze the harmlessness of state trial error in habeas corpus cases and ruled that the writ will not issue unless such an error had a substantial and injurious effect on the verdict. See Brecht, 507 U.S. at 630-638 (acknowledging that Court applied Chapman standard in Yates, but embracing Kotteakos standard henceforth). Furthermore, the Court has recognized specifically in the context of harmlessness review of erroneous jury instructions that the showing necessary to demonstrate that an erroneous instruc-

14

tion is harmless under the latter standard is not as great as that necessary to establish harmlessness under the former standard. See Roy, 117 S. Ct. at 338-39; see also id. at 338 (stating that "the dissenting judges in the Ninth Circuit [in Roy v. Gomez, 81 F.3d 863, 869-71 (9th Cir. 1996) (Wallace, Circuit Judge, concurring and dissenting),] are correct about the proper standard"). Thus, even if we were to conclude that the facts of Yates were indistinguishable--which we do not --we would not find Yates controlling given the later rejection by the Court of the Chapman standard in habeas corpus proceedings.[7]

In short, we have no doubt that the instruction to the jury that malice is presumed from the willful, deliberate, and intentional doing of an unlawful act without just cause or excuse or from the use of a deadly weapon had no substantial and injurious effect on the verdicts. Having accepted that Gilbert and Gleaton inflicted the multiple wounds described by the pathologist's testimony in the manner explained in their confessions, no reasonable jury could have failed to find that the shooting and stabbing were intentional because no reasonable jury could have found that this evidence was consistent with a finding of inadvertence or other legal excuse. As such, the unconstitutional burden-shifting instruction is harmless and provides no basis for habeas relief.

_____

[7] Petitioners also contend that because the State referred to implied malice during its closing argument, we cannot say that the presumption did not substantially and injuriously affect the verdict. We disagree. During closing argument, the prosecution noted that "[m]alice can be implied ... through the use of a deadly weapon." J.A. 2218. However, the argument made by the prosecution explained that malice was a permissible inference from the use of a dangerous weapon. The prosecution did not argue for an unconstitutional mandatory presumption of malice. Moreover, the reference to implied malice in the closing argument comprised less than one page in a closing argument of 35 pages and a trial transcript exceeding 900 pages in length. Cf. Brecht, 507 U.S. at 639 (noting that "[t]he State's references to petitioner's post-Miranda silence were infrequent, comprising less than two pages of the 900-page transcript"); cf. also Cooper, 103 F.3d at 370-72, 375 (concluding that because of the overwhelming evidence presented to the jury, the error in admitting inadmissible confession did not have a substantial or injurious effect on the verdict although prosecution relied heavily on the improperly admitted confession during closing argument).

15

III.

Petitioners, who did not object to joint representation during the state-court guilt and sentencing proceedings, contend that the single attorney by whom they were jointly represented operated under an actual conflict of interest, depriving them of their constitutionally guaranteed right to counsel. We conclude that no conflict existed during the guilt phase of the trial and that Petitioners waived any conflict with respect to the sentencing phase.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel, including the right to representation free from conflicts of interest. See Strickland v. Washington, 466 U.S. 668, 688 (1984). Because joint representation is not per se violative of the Sixth Amendment, see Holloway v. Arkansas, 435 U.S. 475, 482 (1978), and because "[a] defendant is not lightly to be deprived of the counsel of his choice," United States v. Smith, 653 F.2d 126, 128 (4th Cir. 1981), Petitioners can prevail on their claim that they were deprived of constitutionally guaranteed effective assistance of counsel only by demonstrating the existence of an actual conflict of interest, see Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). That is, Petitioners must show that their interests "diverge[d] with respect to a material factual or legal issue or to a course of action." Id. at 356 n.3 (Marshall, J., concurring in part and dissenting in part). Additionally, Petitioners must establish that the conflict adversely affected their attorney's performance. See id. at 348; United States v. Tatum, 943 F.2d 370, 376 (4th Cir. 1991) (holding that an actual conflict of interest adversely affects representation when the attorney takes action on behalf of one client that is necessarily adverse to the defense of the other or fails to take action on behalf of one because it would adversely affect the other). If Petitioners make these showings, prejudice is presumed and they are entitled to habeas relief. See Cuyler, 446 U.S. at 349-50. The question of whether counsel labored under an actual conflict of interest that affected representation is a mixed question of law and fact that we review de novo. See id. at 342.

Petitioners have failed to demonstrate that an actual conflict of interest affected their attorney's representation during the guilt phase of their trial. Petitioners' defense during the guilt phase of the trial consisted of a unified attack on the voluntariness of their confessions.

16

Their interests did not diverge with respect to any legal or factual issue, and counsel did not fail to take action on behalf of one of the Petitioners for fear of injuring the other.

With respect to the sentencing proceedings, Petitioners waived their right to conflict-free counsel.**8** See United States v. Akinseye, 802 F.2d 740, 744-45 (4th Cir. 1986) (holding that a defendant may waive right to conflict-free counsel if waiver is knowing, voluntary, and intelligent). To establish in habeas corpus a deprivation of their constitutional right to effective assistance of counsel, Petitioners must show that they did not intentionally, knowingly, and voluntarily relinquish this right. See Johnson v. Zerbst, 304 U.S. 458, 468-69 (1938); Hoffman v. Leeke, 903 F.2d 280, 288 (4th Cir. 1990); see also Fare v. Michael C., 442 U.S. 707, 724 (1979) (explaining "that the question whether the accused waived his rights `is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights'" (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979))).

Petitioners have failed to establish that they did not intentionally, knowingly, and voluntarily waive their right to conflict-free counsel. See Johnson, 304 U.S. at 468-69 (instructing that habeas petitioner carries the burden of showing the absence of a valid waiver of conflict-free counsel). Rather, the record demonstrates that Petitioners decided that they did not wish to cast blame upon each other and that they instead wanted to pursue a joint defense. Defense counsel testified during the first PCR hearing that he informed Petitioners prior to

_____

**8** Petitioners maintain that independent counsel could have argued that each was less culpable than the other, thereby increasing each Petitioner's chances of avoiding the death penalty. Gleaton contends that independent counsel could have highlighted discrepancies in the testimony of the two men to show that Gilbert had formed an intent to rob the store prior to their arrival, while Gleaton had no such pre-formed intent. Gleaton also alleges that if independent counsel had represented only him, counsel could have argued to the jury that injuries incurred in an automobile accident had led to Gleaton's drug use. Gilbert, on the other hand, asserts that independent counsel could have argued that Gleaton initiated the robbery and inflicted the fatal blows, and that Gilbert, as the younger brother, was led astray by Gleaton.

17

the trial that "there might be [a] point where their interest[s] might be opposed to one another and they indicated they did not think so." J.A. 4835. Counsel further stated that despite this warning, "[t]hey wanted me to represent both of them." Id. And, prior to the 1977 sentencing proceeding, counsel again explained to Petitioners that "the jury could possibly find that the evidence warranted one more culpable than the other." J.A. Supp. 7. More specifically, counsel stated:

> I explained to them that it was possible that the jury, although they found both of them guilty on the charges, that the jury could possibly find a difference in degree of culpability which could possibly result in a different sentencing being handed to them. And they both indicated to me that they have no objections .... And certainly, the fact that I am representing both of them, I did discuss this matter in detail with them. They both indicated to me that they had no objection ....

J.A. Supp. 9. When the trial judge inquired about a conflict of interest precluding counsel from representing both defendants during sentencing, and after taking a break to confer once more with his clients concerning a potential conflict of interest, counsel informed the court that there was no "conflict of interest in me representing both of them" and that having "discussed this matter with them ... they are desirous of me representing both of them." J.A. Supp. 14. The trial court then questioned Petitioners individually, and each indicated that he wanted counsel to represent both of them despite any potential conflict of interest. The record thus unequivocally establishes that Petitioners were advised of their right to conflict-free counsel and the potential grounds from which a conflict might arise and that having been so informed, Petitioners voluntarily chose to proceed with joint representation.

IV.

Petitioners next contend that they were deprived of constitutionally required effective assistance of counsel during the guilt and sentencing phases of their trial. To prevail on this claim, Petitioners bear the burden of demonstrating that their attorney's "representation fell below an objective standard of reasonableness" and "that there is a

18

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984). In assessing counsel's performance, we bear in mind that our review is "highly deferential." <u>Id.</u> at 689. Indeed, we afford a strong presumption that counsel's performance was within the extremely wide range of professionally competent assistance. <u>See id.</u> And, to eliminate the deceptive effects of hindsight on our consideration, we look to "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Id.</u> at 690. Moreover, even those instances in which counsel's conduct fell below an objective standard of reasonableness generally will not justify setting aside a conviction unless the error affected the outcome of the proceeding. <u>See id.</u> at 691-92. Therefore, deficiencies in Petitioners' attorney's conduct would warrant the grant of habeas relief only if Petitioners convince the court that in the absence of unprofessional errors by their attorney there is a reasonable probability--<u>i.e.</u>, one adequate to undermine our confidence in the result--that "the result of the proceeding would have been different." <u>See id.</u> at 694. We review de novo Petitioners' claim that counsel was constitutionally ineffective. <u>See id.</u> at 698.

Petitioners first point to a number of alleged deficiencies in counsel's performance during the guilt phase of their trial. Specifically, Petitioners contend that prior to their trial, counsel failed to make an appropriate independent inquiry into the circumstances of the crime; interviewed only two of the 17 witnesses for the prosecution; failed to examine the physical evidence; met with them for a total of less than three and one-half hours; and failed to study sufficiently the then newly enacted death penalty procedures. Petitioners, however, fail to explain how their attorney's representation of them would have been altered in any way had he done the things that they allege he failed to do. Consequently, Petitioners have failed to show that any of these alleged deficiencies prejudiced them.

Petitioners also assert that their attorney's representation of them during the 1980 resentencing proceeding was constitutionally ineffective. They argue that counsel failed to retain either a pharmacological expert to explain how their drug use would have impaired them at the time of the crime or a psychiatric expert. In addition, Petitioners con-

19

tend that a proper investigation into their background would have disclosed a number of character witnesses who could have testified to mitigating facts--for example, that they had maintained steady employment and had no prior criminal background.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691; see Satcher, 126 F.3d at 572 (explaining that "`[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments'" (quoting Strickland, 466 U.S. at 691)). Petitioners contend that counsel was ineffective for failing to retain a psychological expert to examine them for the purpose of developing mitigating evidence. Petitioners, however, underwent psychiatric evaluations prior to trial, and the reports of these examinations revealed that Petitioners were sane at the time of the crimes and were competent to stand trial. Furthermore, the reports did not suggest any serious mental or emotional problems warranting further investigation for potentially mitigating evidence. Compare Loyd v. Smith, 899 F.2d 1416, 1426 (5th Cir. 1990) (holding that counsel was ineffective for failing to retain psychiatric expert when "the record [was] replete with indications that a further investigation of [petitioner's] mental state should have been undertaken"), with Laws v. Armontrout, 863 F.2d 1377, 1389 (8th Cir. 1988) (en banc) (holding that counsel was not ineffective for failing to investigate and present psychiatric mitigating evidence where "[n]othing made known to counsel during his representation of [defendant] ... suggested to counsel that presenting evidence of [defendant's] psychiatric state would be of any benefit in his defense" (internal quotation marks omitted)). At most, the reports available to counsel established that Petitioners' mental functioning was limited, falling short of mental retardation. We cannot say that in light of the reports of the mental examinations performed, counsel's failure to retain a psychiatric expert to investigate this area further or to provide mitigating testimony fell outside the broad range of professionally adequate conduct. See Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (noting that relevant question in determining whether counsel's performance was constitutionally acceptable is not "what the best lawyers would have done" nor "even what most good lawyers would have done," but instead "whether some reasonable

20

lawyer ... could have acted, in the circumstances, as defense counsel acted" (internal quotation marks omitted)).

Petitioners also claim that counsel was ineffective for failing to locate and present the testimony of other witnesses who could have presented mitigating evidence.**9** But, counsel is not constitutionally required to interview every family member, neighbor, and coworker in the search for mitigating evidence. Counsel asked Petitioners and their mother for information concerning witnesses who would be helpful and spoke with the witnesses to whom he was directed. Counsel ultimately presented the testimony of the Gilbert family's minister, concerning Petitioners' religious devotion, and of Petitioners' mother. Counsel also had Petitioners explain their good employment background and the circumstances surrounding the murder, including their use of drugs. Because counsel conducted a reasonable investigation for mitigating evidence and found nothing more that, in his professional judgment, could be employed in Petitioners' defense, we conclude that counsel did not perform unprofessionally in failing to investigate further.

Moreover, even if Petitioners could overcome the presumption that counsel's performance was within the broad range of professionally acceptable conduct, we are not convinced that they have satisfied the prejudice prong of Strickland. The evidence that Petitioners argue would have been obtained if counsel had performed competently does not undermine our confidence in the verdict. Although evidence that a defendant suffers from a mental impairment or has abused drugs or narcotics may diminish his blameworthiness for his crime, this evidence is a two-edged sword. See Howard, 1997 WL 755428, at *17. In sum, Petitioners were not deprived of constitutionally adequate assistance of counsel.

_____

**9** Gilbert submits that counsel could have presented the testimony of several members of the community--including a retired police chief, a teacher, an attorney, and a former employer--to testify concerning his background and character. And, Gleaton asserts that had counsel made an adequate investigation, he would have discovered nine individuals from Florida--among them Gleaton's wife, friends, coworkers, and landlord--who would have testified to his good character.

21

V.

Gleaton also claims that the state trial court deprived him of his constitutional rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments by failing to exclude for cause prospective jurors who indicated that they could not consider lack of a criminal record as a mitigating circumstance. None of the jurors that Gleaton contends were improperly qualified, however, sat on the jury; they were all struck by peremptory challenges. Thus, Gleaton was not denied his right to an impartial jury. See Ross v. Oklahoma, 487 U.S. 81, 88 (1988) (holding that even though trial court erred in qualifying a juror, defendant's constitutional rights were not violated because he had to use a peremptory challenge to excuse the juror, stating, "we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury"); Satcher, 126 F.3d at 573-74; Gaskins v. McKellar, 916 F.2d 941, 949 (4th Cir. 1990) (explaining that "`[a]ny claim that the jury was not impartial ... must focus ... on the jurors who actually sat' and cannot be established simply by showing the loss of a peremptory challenge" (second & third alterations in original) (quoting Ross, 487 U.S. at 86)).

VI.

Finally, three additional claims are presented, each of which we conclude is procedurally defaulted. First, Petitioners assert that their right to due process was violated by a systematic exclusion of black persons from the venire by the prosecution. Second, Gleaton contends that the submission by the trial court of the aggravating circumstances that Petitioners committed the murder during the commission of a robbery while armed with a dangerous weapon and that Petitioners committed the murder during the commission of a larceny while armed with a dangerous weapon violated the Eighth and Fourteenth Amendments because it allowed the jury to weigh twice what was essentially the same aggravating circumstance. And, third, Gleaton contends that the trial court should have instructed the jury sua sponte that it should draw no adverse inference concerning Gleaton's guilt simply from his invocation of his Fifth Amendment right to remain silent and that the jury should not consider Gilbert's confession as evidence of Gleaton's guilt.

22

Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).[10]

A.

Petitioners contend that their constitutional rights were violated by the State's systematic use of peremptory strikes to exclude blacks from the jury. See Swain v. Alabama, 380 U.S. 202 (1965). Following jury selection in the 1980 resentencing trial, defense counsel brought to the attention of the court that the prosecution had struck every black prospective juror. The trial court denied defense counsel's "motion," noting that

> a bare motion, which is nothing but an assertion, that the action of the State in exercising its peremptory challenges was the result of prejudice by reason of striking blacks, without any further showing, would not be adequate. I think what little authority there is on the subject would indicate that ... to be considered it must be proven that it has been a long established practice substantiated by statistics in order for it to be given any consideration at all.

J.A. 3390-91.[11] In preparing his post-trial report, the state trial judge

---

[10] Petitioners make no attempt to establish cause and prejudice or a fundamental miscarriage of justice to excuse the default, and therefore we do not consider whether either exist. See Kornahrens v. Evatt, 66 F.3d 1350, 1361-62 (4th Cir. 1995).

[11] It was not until 1986, well after Petitioners' convictions and sentences became final, that the Supreme Court decided Batson v. Kentucky, 476 U.S. 79 (1986), holding that a defendant's Fourteenth Amendment rights are violated by a prosecutor's use of a peremptory strike on the basis of race. Petitioners advance no Batson claim in these proceedings. See Allen v. Hardy, 478 U.S. 255 (1986) (holding that Batson rule does not apply retroactively on collateral review of convictions that became final before Batson was decided).

marked the box indicating "Yes" to the question, "Was there any evidence that members of the defendant's race were systematically excluded from the jury?" and added a notation "by peremptory challenges of State." J.A. 5586. Petitioners, however, did not raise this claim on direct appeal.

Petitioners next asserted a <u>Swain</u> claim in their first PCR application. The PCR court heard testimony on the issue and rejected it, finding credible the lead prosecutor's testimony "that his office [did] not have a policy of using peremptory challenges to exclude blacks." J.A. 6017. Petitioners, however, did not pursue this claim in their petitions for writs of certiorari to the South Carolina Supreme Court. In their second PCR application, Petitioners again raised this claim. The second PCR court initially rejected the State's argument that this issue should be dismissed as successive, noting that although the issue previously had been raised in the first PCR application, the failure to consider it would result in "a gross miscarriage of justice," and consequently the issue fit within an exception to the bar upon successive petitions. J.A. 5511. After conducting an evidentiary hearing with respect to this issue, however, the second PCR court ruled:

> In ground VI, 9(f), the applicants reasserted their complaint about the prosecutor's use of peremptory challenges. While initially this "<u>Batson</u>" issue caused me considerable worry, an extensive review of the record reveals that this issue was raised at the initial state post-conviction relief proceeding ... and specifically denied by the state post-conviction relief court. No issue concerning the selection of the jury was in the certiorari petition to the Supreme Court. The applicants[ ] abandoned that issue in the appeal from the denial of state post-conviction relief.

J.A. 6444. The court went on to explain that in addition to the abandonment of the issue in the petition for certiorari, the claim did not provide a basis for relief because further review was barred by res judicata,**12** having been determined against Petitioners in the first PCR

---

**12** Under South Carolina law, the doctrine of res judicata bars consideration in PCR proceedings of, <u>inter alia</u>, claims that have previously been raised and decided on the merits. <u>See Gamble v. State</u>, 379 S.E.2d 118, 119 (S.C. 1989); <u>Foxworth v. State</u>, 274 S.E.2d 415, 416 (S.C. 1981).

application. Accordingly, although the second PCR court initially refused to find the Swain claim successive, it ultimately reconsidered that ruling and disposed of the claim on the basis that it had been abandoned in the petition for certiorari from the first denial of PCR and that further consideration was barred. This disposition constitutes an adequate and independent state ground for decision. Thus, this claim is procedurally defaulted.**13**

B.

Gleaton next contends that the submission by the trial court of the aggravating circumstances that Petitioners committed the murder during the commission of a robbery while armed with a dangerous weapon and that Petitioners committed the murder during the commission of a larceny while armed with a dangerous weapon violated the Eighth and Fourteenth Amendments because it allowed the jury to weigh what is essentially the same aggravating circumstance twice. On direct appeal from the resentencing, Gleaton argued that the submission of both of these aggravating factors constituted a violation of the Double Jeopardy Clause of the Fifth Amendment. Specifically, Gleaton argued that during the first sentencing hearing, the jury had not found the aggravating factor that the crime was committed during a larceny, so the submission of that factor during the resentencing trial constituted a violation of double jeopardy. Gleaton did not raise any claim relating to the submission of the two aggravating circumstances during his first PCR application. During the second PCR proceeding, Gleaton raised his present argument for the first time. The second PCR court dismissed the claim as successive.**14** See S.C. Code Ann.

_____

**13** Even if we were to reach the merits, however, this claim would not provide a basis for relief because Petitioners have failed to offer any reason why the finding of the first PCR court that there was no systematic exclusion by the State does not constitute a finding of fact to which a presumption of correctness applies. See 28 U.S.C.A. § 2254(d) (West 1994). We could not say that this finding is unsupported by the record, and as such, Petitioners' Swain claim would fail on the merits.

**14** "[A] federal court does not have license to question a state court's finding of procedural default ...." Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995). We note, however, that although the second state PCR court concluded that the claim was barred as successive, it incorrectly reasoned that this was so because the issue had been rejected on direct appeal. It is clear that the claim was not raised on direct appeal.

25

§ 17-27-90 (Law. Co-op. 1985). Thus, this claim is procedurally defaulted.**15**

C.

Finally, Gleaton contends that the trial court should have instructed the jury sua sponte that it should draw no adverse inference concerning his guilt simply because he invoked his right to remain silent guaranteed by the Fifth Amendment. See Carter v. Kentucky, 450 U.S. 288, 300 (1981) (holding that a trial court must give a "no adverse inference" instruction when requested to do so). This claim is procedurally defaulted.

---

**15** Even if this claim were not procedurally defaulted, it is without merit. The purpose of aggravating circumstances is to narrow the class of persons who are eligible for the death penalty to those defendants among murderers who are most deserving of it. See Lowenfield v. Phelps, 484 U.S. 231, 244 (1988). The Eighth Amendment does not require that aggravating circumstances be weighed against mitigating circumstances by the jury, although some states have established such systems. See Blystone v. Pennsylvania, 494 U.S. 299, 306-07 (1990). South Carolina is a non-weighing state; the jury is not instructed to weigh aggravating factors against mitigating factors. See State v. Elkins, 436 S.E.2d 178, 180 (S.C. 1993). Thus, under South Carolina law:

> Additional aggravating circumstances provide only alternative bases for placing a defendant in the category of persons subject to capital punishment. Additional aggravating circumstances do not, under [South Carolina law], contribute to the actual selection of the death penalty because juries ... are not instructed to "weigh" circumstances of aggravation against circumstances of mitigation.

State v. Plath, 313 S.E.2d 619, 629 (S.C. 1984). Here, consistent with South Carolina law, the jury was instructed that after it found one aggravating circumstance beyond a reasonable doubt, the jury could impose the death penalty, but that it need not do so; the jury could impose a life sentence even if it was not convinced of the existence of any mitigating circumstance. Because Gleaton's jury did not weigh the aggravating circumstances against the mitigating circumstances, it could not have given "too much" weight to an aggravating circumstance by "counting" it twice. Accordingly, this claim lacks merit.

26

During the guilt phase of the trial, the principal defense offered was that Petitioners' confessions had been obtained involuntarily and could not be used against them. Without the confessions, the defense argued, the State's case was insufficient to prove Petitioners' guilt beyond a reasonable doubt. To advance this claim, Petitioners testified to the events that occurred between the time of their arrests and the time of their confessions. Although by taking the witness stand Petitioners waived their Fifth Amendment right against compelled self-incrimination, the trial court permitted them to invoke the Fifth Amendment on cross-examination. The trial court instructed the jury that "[t]he fact that a person invokes or takes the Fifth Amendment raises no presumption as to the guilt or innocence of the accused." J.A. 2281.

On direct appeal, Petitioners raised the voluntariness of their confessions, but the South Carolina Supreme Court rejected the contention that the confessions were involuntary. Turning to the argument concerning whether the procedure followed by the state trial court of permitting Gilbert and Gleaton to take the stand to testify on direct examination, but allowing them to invoke their Fifth Amendment privilege on cross-examination, the South Carolina Supreme Court continued, "We next consider an issue not raised in appellants' brief, but which, because of the imposition of the death sentence, we review under the doctrine of in favorem vitae." Gilbert, 258 S.E.2d at 893. A majority of the court concluded that because Petitioners had waived their right against self-incrimination by taking the stand, the trial court provided them greater protection than the Constitution required by allowing them to invoke the privilege. Therefore, the court held, Gilbert and Gleaton "were not prejudiced by this procedure." Id. at 894. The court did not address the issue that Gleaton raises here-- whether the trial court erred in failing to give a"no adverse inference" instruction. See id. at 891-94.

In his first PCR application, Gleaton raised the failure of the trial judge to give a "no adverse inference" instruction. The PCR court dismissed the claim, holding that because it had not been raised on direct appeal, it was procedurally defaulted. Gleaton did not raise the issue in his petition for certiorari to the South Carolina Supreme Court from the denial of PCR. Gleaton attempted again to raise the issue in his second PCR proceeding, but that court held that the issue was succes-

27

sive. Gleaton did not raise the issue in his petition for certiorari to the South Carolina Supreme Court. As a result, this issue is procedurally defaulted.**16**

VII.

Finding no error warranting the grant of habeas relief, we reverse in appeal numbers 96-12 and 96-13 and affirm in appeal numbers 96-15 and 96-16.

Nos. 96-12, 96-13 - <u>REVERSED</u>
Nos. 96-15, 96-16 - <u>AFFIRMED</u>

HAMILTON, Circuit Judge, concurring in part and concurring in the judgment:

I concur in all of Judge Wilkins' opinion except Parts VI A and B. In my view, the claims asserted by the petitioners in Parts VI A and B are not procedurally defaulted. However, because the claims are, for the reasons stated in footnotes 13 and 15 of Judge Wilkins' opinion, without merit, I concur in the judgment.

MICHAEL, Circuit Judge, concurring:

I concur in the judgment and in Parts I through V and Part VII of

---

**16** Likewise, Gleaton's claim that the trial court should have instructed the jury that Gilbert's confession could not be considered as evidence of Gleaton's guilt is procedurally defaulted. Gleaton raised no argument at trial or on direct appeal concerning the failure of the trial court to instruct concerning the proper use of Gilbert's confession. Gleaton raised the failure of the trial judge to give an instruction limiting the use of Gilbert's confession in his first PCR application. The PCR court dismissed the claim, holding that because it had not been raised on direct appeal, it was procedurally defaulted. Gleaton did not raise the issue in his petition for certiorari to the South Carolina Supreme Court from the denial of PCR. Gleaton attempted again to raise the issue in his second PCR proceeding, but that court held that the issue was successive. Gleaton did not raise the issue in his petition for certiorari to the South Carolina Supreme Court.

28

the majority opinion. I would decide the issues raised in part VI on the merits in favor of the State.

DIANA GRIBBON MOTZ, concurring in parts I through V, part VII, and the judgment:

I originally joined the panel opinion affirming the district court's grant of writs of habeas corpus to Larry Gilbert and J. D. Gleaton. On further study, I have determined that I must vote to reverse. The analysis and authorities Judge Wilkins has marshalled in part II of his opinion for the court makes this conclusion inescapable. I am also pleased to join the remainder of Judge Wilkins' fine opinion, except for part VI. I agree with the majority that the State also prevails on the grounds discussed in that portion of the opinion but, like Judge Michael, I would decide those questions on the merits. See ante n.13, n.15, and n.16.

29