**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DAVID JUNIOR WARD,
Petitioner-Appellant,

v.

No. 98-7

JAMES B. FRENCH, Warden, Central
Prison, Raleigh, North Carolina,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-97-122-5-HC-BO)

Argued: September 23, 1998

Decided: October 23, 1998

Before WILKINS, NIEMEYER, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Wilkins wrote the opinion,
in which Judge Niemeyer and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Marvin Ray Sparrow, Durham, North Carolina, for
Appellant. Valerie Blanche Spalding, Special Deputy Attorney Gen-
eral, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,
North Carolina, for Appellee. **ON BRIEF:** Dawn T. Battiste, EVER-
ETT & EVERETT, Durham, North Carolina, for Appellant. Michael
F. Easley, Attorney General of North Carolina, NORTH CAROLINA

DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appel-
lee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

WILKINS, Circuit Judge:

David Junior Ward appeals an order of the district court denying
his petition for a writ of habeas corpus,[1] which challenged his North
Carolina conviction and death sentence for the murder of Dorothy
Mae Smith. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 1998).[2]
Finding no error, we affirm.

I.

The facts are set forth in detail in the opinion of the Supreme Court
of North Carolina on direct appeal. See State v. Ward, 449 S.E.2d
709, 715-16 (N.C. 1994). Accordingly, we need only summarize them
briefly here. At approximately 10:30 p.m. on the evening of April 3,
1991, Smith closed the convenience store she owned with her hus-

_____

[1] Ward named James B. French, Warden of Central Prison where Ward
is incarcerated, as Respondent. For ease of reference, we will refer to
French as "the State" throughout this opinion.

[2] Because Ward's petition for a writ of habeas corpus was filed after
the April 24, 1996 enactment of the Antiterrorism and Effective Death
Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, the
amendments to 28 U.S.C.A. § 2254 effected by§ 104 of the AEDPA
govern the resolution of this appeal. See Green v. French, 143 F.3d 865,
868 (4th Cir. 1998); see also Lindh v. Murphy , 117 S. Ct. 2059, 2067-68
(1997) (holding that habeas petitions filed prior to the effective date of
the act are not governed by the Chapter 153 AEDPA amendments). The
State does not maintain that the provisions of § 107 (including the more
stringent procedural default provisions) of the AEDPA apply.

band and proceeded to her home in Greenville, North Carolina, carrying approximately $4,000 in cash, some checks, and a few personal items. Shortly thereafter, a neighbor, Lonnie Daniels, heard five gunshots in rapid succession. Daniels and a friend went to the Smiths' home and found her lying on the ground near the back door, bleeding and unresponsive. Smith later died from her wounds. A subsequent autopsy revealed that she had been shot five times by small caliber weapons fired from a distance greater than three or four feet.

The following day, law enforcement officers apprehended Ward on unrelated charges. Ward then made a statement regarding the murder of Smith, which was reduced to writing by a detective:

> David stated that yesterday he came to Greenville and got up with Wesley Harris. David said Wesley said he had a job to do that night. David said Wesley said they were going to rob [Smith] when she closed the store. He stated that they went by the store and she was there so they rode around until it got dark. David said about 10:00 p.m. that they parked Wesley's blue Saab car on the road that runs off between the store and the Smith house. We ran across the road and got in the bushes next to the driveway. I had a rifle and Wesley had a pistol. The rifle was a .22 caliber and the pistol was a .32 caliber. When Mrs. Smith pulled in the driveway and pulled around back and got out of the truck, we started shooting. Wesley ran and got the money box after she fell and we ran across the road and got in the car and left. We put the money in the ditch near Empire Brushes. We got a money box and a white plastic bag. I called a cab and went to my girlfriend's house near Belvoir. Before I could get up with Wesley the next day, the cops got me. David said Wesley kept both guns that were used.

Id. (internal quotation marks omitted). Ward also made a written statement that was consistent with his oral statement. Thereafter, Ward assisted officers in locating Harris, the weapons employed in the attack on Smith, and the proceeds of the robbery.

Ward subsequently was convicted of numerous charges related to the robbery and murder of Smith, including first-degree murder. The

3

jury recommended that Ward be sentenced to death for the murder conviction based on its conclusions that Ward had committed the murder for pecuniary gain and that the mitigating circumstances found by the jury--that Ward had aided in the apprehension of a capital felon; that Ward had confessed guilt and cooperated with law enforcement officers; and that it was not proven which firearm Ward had used--were insufficient to outweigh the aggravating factor. See id. at 717.

The Supreme Court of North Carolina affirmed Ward's conviction and sentence, see id. at 746, and the United States Supreme Court denied certiorari, see Ward v. North Carolina , 514 U.S. 1134 (1995). Ward then filed a motion for appropriate relief in the Pitt County Superior Court. That court denied relief without a hearing, reasoning that Ward's claims were either defaulted, barred, or without merit. The Supreme Court of North Carolina denied certiorari, as did the United States Supreme Court. See State v. Ward , 473 S.E.2d 626 (N.C.), cert. denied, Ward v. North Carolina, 117 S. Ct. 534 (1996).

In March 1997, Ward filed this action in the district court, alleging numerous claims. The district court denied relief. See Ward v. French, 989 F. Supp. 752, 768 (E.D.N.C. 1997), amended , No. 5:97-HC-122-BO (E.D.N.C. Feb. 17, 1998). Having received a certificate of appealability from the district court, Ward now appeals.

II.

We first address Ward's claim that the statutory power of the district attorney to calendar cases for trial violates the Due Process Clause of the Fourteenth Amendment. See N.C. Gen. Stat. §§ 7A-49.3, 7A-61 (1995). According to Ward, the power to schedule cases amounts to the power to select the presiding judge, thereby giving the prosecution an unfair advantage. Ward asserts that this power was used to his disadvantage when his trial was scheduled before the same judge who tried Harris. The state habeas court rejected this claim, noting that the Supreme Court of North Carolina has held the challenged statutory provisions facially constitutional, see Simeon v. Hardin, 451 S.E.2d 858, 869-71 (N.C. 1994), and concluding that Ward had failed to file an affidavit that would support an as-applied challenge, see N.C. Gen. Stat. § 15A-1420(b)(1) (1997).

4

Ward points to no relevant precedent from the United States Supreme Court that supports his facial challenge to the district attorney's statutory authority to calendar criminal cases, and we are aware of none. In the absence of any controlling--or even relevant--Supreme Court precedent, we cannot say that the rejection of Ward's facial challenge by the state habeas court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); see Green v. French , 143 F.3d 865, 870 (4th Cir. 1998) (explaining that analysis of whether state court ruling is contrary to, or unreasonable application of, federal law depends upon an analysis of relevant Supreme Court precedent). We further determine that the ruling of the state habeas court that the affidavits proffered by Ward in support of his as-applied challenge were inadequate was not an unreasonable factual determination. See 28 U.S.C.A. § 2254(d)(2).

III.

Next, Ward raises two claims related to the selection of the jury that convicted him. First, Ward maintains that the trial court erroneously excused for cause potential jurors on the basis that their opposition to the death penalty would prevent them from applying the law. Second, Ward claims that the process of "death qualifying" the venire resulted in a jury more likely to convict and thus denied him a fair trial. We address these claims in turn.

A.

It is well settled "that the State infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express conscientious objections to capital punishment." Wainwright v. Witt, 469 U.S. 412, 416 (1985); see Witherspoon v. Illinois, 391 U.S. 510, 521-23 (1968). At the same time, however, the Court has recognized that the State possesses a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." Wainwright, 469 U.S. at 416. A prospective juror may be excused for

5

cause based on opposition to the death penalty when it is established that "the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

Here, the trial court asked each prospective juror a series of three questions designed to determine whether that person could comply with the law of North Carolina regarding the imposition of the death penalty. Ward concedes that these questions comport with Wainwright, but asserts that the trial court violated Ward's constitutional rights by failing to inquire further of venire members who gave inconsistent answers to these questions and by refusing to allow counsel to attempt to rehabilitate such persons. Essentially, Ward maintains that despite asking the correct questions, the trial court misapplied the Wainwright standard by excluding jurors without first determining whether their views in opposition to capital punishment would prevent them from performing their duties as jurors.

The determination of a trial court with respect to whether a prospective juror's views on capital punishment will prevent the juror from applying the law is essentially a factual one resting on an assessment of demeanor and credibility. See id. at 428-29; Maynard v. Dixon, 943 F.2d 407, 415 (4th Cir. 1991). Under the AEDPA, therefore, Ward is not entitled to relief on this claim unless the decision of the trial court to excuse potential jurors based on their answers to voir dire questions "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2). Additionally, when the record reflects ambiguity in a prospective juror's response to voir dire, "the determination made by the trial court, based on its eyeing the juror, is presumed to be consistent with the applicable standard." Maynard, 943 F.2d at 415; see Truesdale v. Moore, 142 F.3d 749, 757 (4th Cir. 1998). Having reviewed the transcript of the voir dire proceedings, we cannot say that the decision of the trial court to excuse jurors who gave inconsistent answers to voir dire questions regarding their willingness to recommend the death penalty rested on an unreasonable determination of the facts based on the evidence before it.

6

B.

Ward next asserts that the process of excluding potential jurors under Wainwright rendered the resulting jury more likely to convict, thereby violating his constitutional rights. The Supreme Court of North Carolina rejected this claim on the basis of its prior holdings. See, e.g., State v. Brown, 293 S.E.2d 569, 584 (N.C. 1982). We conclude that this decision was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. See Lockhart v. McCree, 476 U.S. 162, 173 (1986) (holding "that the Constitution does not prohibit the States from `death qualifying' juries in capital cases" even if the death-qualification process renders the resulting jury more prone to convict).

IV.

During opening arguments, Smith's husband, who was seated near the prosecution's table and in view of the jury, began crying audibly and left the room. Ward claims that the district attorney deliberately seated Mr. Smith near the jury with the knowledge that he was likely to engage in an emotional outburst that would prejudice the jury against Ward, in violation of the Fourteenth Amendment. The state habeas court concluded that this claim lacked merit. 3 Since Ward has pointed to no Supreme Court authority for the proposition that the prosecuting authority violates any constitutional right of the defendant in seating members of the victim's family where they may view--and in turn be viewed by--the jury, we conclude that the rejection of this claim was not unreasonable. See 28 U.S.C.A.§ 2254(d)(1); Green, 143 F.3d at 870.

_____

3 Although Ward failed to raise this issue on direct appeal, the state habeas court nevertheless concluded that it had been raised and decided on the merits on direct appeal. The state habeas court, however, also independently reviewed the claim and determined that it lacked merit. We accordingly review this ruling.

V.

While making closing arguments during the guilt phase of Ward's trial, the district attorney made the following comments regarding the failure of the defense to produce certain evidence forecast during Ward's opening statement:

> I mean, if he knows all this--I mean, I'd like for him to put a hand on the Bible, take an oath. He had every opportunity to get up here and tell it, if that is what he knows. He didn't do it.

Ward, 449 S.E.2d at 728 (internal quotation marks omitted). Ward complains that the district attorney's statement amounted to an impermissible comment on Ward's failure to testify and that the trial court should have intervened sua sponte to correct the error.

The Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615 (1965). This constitutional prohibition, however, does not preclude a prosecutor from making "a fair response to a claim made by defendant or his counsel." United States v. Robinson, 485 U.S. 25, 32 (1988). "[T]he protective shield of the Fifth Amendment should[not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case." Id. (internal quotation marks omitted).

When the district attorney's comments are viewed in isolation, Ward's argument that they were directed toward his failure to testify has some appeal. Consideration of the context in which comments are made, however, is essential to a determination of whether constitutional rights have been violated. See id. at 33. Here, the Supreme Court of North Carolina concluded that the comments of the district attorney, viewed in context, were simply a fair response to the failure of the defense to produce certain forecasted evidence.[4] See Ward, 449 (Text continued on page 10)

_____

[4] The comments challenged by Ward occurred in the context of the following argument:

8

I feel like we need to turn on a fan and blow smoke out of this courtroom....

....

Now you folks think about it. Mr. Evans got in front of you on Monday, ... and in his opening statement, after the judge had told you that this is an outline of what the attorney believes is competent, admissible evidence, and he said, ladies and gentlemen, ... there will be evidence that will show that Wesley Thomas Harris thought that there was cocaine in Dorothy Mae Smith's house and that he went and told David Ward about it and said, you know, Im going to ... go down there to Dorothy Mae Smith's house ... and we are going to hide there. And when she comes, we are going to force her to go in the house and show us where the cocaine is. This is what he is telling you that the evidence is going to be. And then he says they rode around. He, Wesley Harris, and David Ward rode around and that David smoked some cocaine.

Now, I'm going to tell you, folks, I didn't hear any of that evidence come from the witness stand. Why would he tell you this? Why? Smoke. <u>I mean, if he knows all this--I mean I'd like for him to put a hand on the Bible, take an oath. He had every opportunity to get up here and tell it, if that is what he knows. He didn't do it.</u>

What else did he say in his opening statement? He said, well, after they talked about this, he said the evidence would show that Wesley dropped the defendant Ward off and came back later that afternoon and picked him up again. And then ... the defendant, David Ward, smoked some more cocaine. And that then they rode out there to the store, saw the deceased, Dorothy Mae Smith, still in the store and went and parked the car and got in the bushes. And that David Ward was high as [a] kite.... There [is not] one scintilla of evidence about that.

And then he goes on to say ... that Wesley ... pulled out a .32 and he gave the defendant Ward the bolt action and that at that time the deceased, Dorothy Mae Smith, drives up in the driveway and she gets out of her car. And he, that is one or both of them, saw this gun, this .38 that she had, and they got scared. Well, did you hear any evidence of that?

9

S.E.2d at 729; see Lockett v. Ohio, 438 U.S. 586, 595 (1978) (holding that prosecutor's comments regarding "uncontradicted" evidence did not violate the Constitution when they were merely responsive to defendant's failure to produce the defense asserted during opening argument (internal quotation marks omitted)). This ruling neither was contrary to, nor involved an unreasonable application of, federal law as determined by the Supreme Court.**5** Cf. United States v. Mares, 940

_____

And that at that point Wesley pulled out the Ruger too.... [H]es telling you the evidence is going to show that Wesley has got the Ruger in one hand and the .32 in another hand.

I mean, folks, this is a fairy tale. Then he says that the evidence is further going to show that Dorothy Mae Smith turns and sees them, and is scared and she starts going towards the door; and that Wesley then shoots one time with the .32 and it jams and then he shoots a number of times with the Ruger. He says he drops the .32 and shoots with the Ruger; that David shoots one time with the bolt action .22. And then they pick the stuff up and leave. I mean, folks, Im going to tell you there [is] not one scintilla of evidence to support that.

Why did he tell you all that? Why did he tell you that is what the evidence was going to be? You havent heard it....

Where is all this stuff, Mr. Evans?

Tr. 1410-13 (emphasis added).

**5** Even if the decision of the Supreme Court of North Carolina was unreasonable, "[r]espect for the finality of a presumptively valid state-court conviction and sentence dictates that [we] may not grant habeas corpus relief ... unless [we are] convinced that `the error had substantial and injurious effect or influence in determining the... verdict.'" Gilbert v. Moore, 134 F.3d 642, 647 (4th Cir. 1998) (en banc) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)) (fifth alteration in original), cert. denied, ___ U.S.L.W. ___ (U.S. Oct. 5, 1998) (Nos. 97-9198, 97-9264); see Chapman v. California, 386 U.S. 18, 24-26 (1967) (conducting harmless-error review of Griffin error). The evidence of Ward's guilt --which included his detailed confession the day after the murder was committed--simply was overwhelming. See United States v. Hasting, 461 U.S. 499, 510-12 (1983) (concluding on direct appeal that a Griffin error was harmless when evidence of defendant's guilt was "compel-

10

F.2d 455, 460-61 (9th Cir. 1991) (holding that prosecutor's statements regarding expected inadequacy of defense counsels' argument did not amount to comments on defendant's failure to testify).

VI.

Next, Ward raises several claims related to the sentencing phase of his trial. We address these contentions seriatim.

A.

At sentencing, Ward sought to establish the statutory mitigating factor that he had "aided in the apprehension of another capital felon or testified truthfully on behalf of the prosecution in another prosecution of a felony." N.C. Gen. Stat. § 15A-2000(f)(8) (1988). In order to show that he had aided in the apprehension of a capital felon, Ward called as a witness the court clerk from Harris' trial and elicited testimony that Harris had been convicted of a capital crime. On cross-examination, the clerk testified that Ward had been called as a witness during Harris' trial and had refused to testify. The prosecution subsequently argued that Ward's refusal to testify during Harris' trial diminished the mitigating value of his aid in apprehending Harris. Ward claims that the cross-examination and argument concerning his refusal to testify at Harris' trial violated his rights to a fair trial and to remain silent. The Supreme Court of North Carolina concluded that any error was harmless beyond a reasonable doubt, see Chapman v. California, 386 U.S. 18, 24 (1967), in light of the fact that the jury "rejected [the district attorney's] argument and found both the statutory mitigating circumstance ... and the other, more specific nonstatutory mitigating circumstance submitted in this regard--that [Ward]

_____

ling"). Moreover, the comments challenged by Ward constituted only a brief moment during an extended closing argument and did not urge the jury to draw an inference of guilt from Ward's silence. Cf. Anderson v. Nelson, 390 U.S. 523, 523-24 (1968) (per curiam) (concluding that Griffin error cannot be harmless when the "comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal").

11

confessed guilt to, and cooperated with, law enforcement officials the day following the crimes," Ward, 449 S.E.2d at 738. We cannot say that this ruling constituted an unreasonable application of the Chapman standard. See 28 U.S.C.A. § 2254(d)(1).

B.

Ward next contends that the trial court erred in precluding Dr. Patricio Lara, a forensic psychiatrist who testified regarding Ward's mental status at the time of the offense and his history of drug usage, from relating conversations with Ward upon which Dr. Lara's conclusions were partially based. In particular, Ward sought to elicit testimony that he had told Dr. Lara that he abused drugs and that he could not remember what occurred on the night of the murder. The Supreme Court of North Carolina agreed that the exclusion of this testimony was error, but ruled that the error was harmless beyond a reasonable doubt. See Ward, 449 S.E.2d at 732-33.

This holding was not an unreasonable one. See 28 U.S.C.A. § 2254(d)(1). In the first place, the jury had before it expert testimony from Dr. Lara that Ward had a history of drug abuse. Additionally, Ward's sister testified that she had observed Ward smoking cocaine base two days before the murder and had previously noticed Ward behaving strangely, leading her to believe that he was using drugs. Another witness testified that he saw Ward using narcotics with Harris on the day of the murder. Moreover, as the Supreme Court of North Carolina pointed out, testimony that Ward could not remember what occurred on the night of the murder would be patently inconsistent with his detailed confession to police the following day; thus, the exclusion of testimony regarding a claimed drug-induced memory loss "probably redounded to [Ward's] benefit" by avoiding the presentation of inconsistent factual positions. Ward, 449 S.E.2d at 733.

C.

Ward also claims that the trial court deprived him of his rights under the Eighth and Fourteenth Amendments by refusing to allow him to introduce, as mitigating evidence, the life sentence received by Harris. "`[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating

12

factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (second alteration in original) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion)). Evidence of the sentence received by a codefendant, however, is neither an aspect of the defendant's character or record nor a circumstance of the offense. See Brogdon v. Blackburn, 790 F.2d 1164, 1169 (5th Cir. 1986). Moreover, such evidence does not "tend[ ] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." McCoy v. North Carolina, 494 U.S. 433, 440 (1990) (internal quotation marks omitted). Accordingly, the rejection of this claim by the Supreme Court of North Carolina did not constitute an unreasonable application of the principle set forth in Eddings. See 28 U.S.C.A. § 2254(d)(1).**6**

D.

During the sentencing phase of his trial, Ward presented evidence supporting numerous nonstatutory mitigating factors for the consideration of the jury. The jury found only one of these proposed nonstatutory mitigating factors--that Ward had confessed guilt and cooperated with law enforcement officers on the day after the crime.

_____

**6** Ward asserts that the opinion of the Supreme Court in Parker v. Dugger, 498 U.S. 308 (1991), "strongly suggests that a co-defendant's sentence is a relevant mitigating circumstance." Brief of Appellant at 32. The Supreme Court of North Carolina rejected Ward's reading of Parker, reasoning that while the Parker Court recognized that Florida law attached mitigating value to the sentence received by an accomplice, the Court intimated no holding that the admission of such evidence was required as a matter of constitutional law. See Ward, 449 S.E.2d at 737. We agree. In Parker, the Court reviewed the constitutionality of a decision of the Florida Supreme Court affirming Parker's death sentence after striking two aggravating factors found by the trial court. In the course of its analysis, the Court noted that the trial judge must have considered mitigating evidence regarding a codefendant's sentence because such evidence was deemed to have mitigating value under Florida law. See Parker, 498 U.S. at 315-16. At no point, however, did the Court suggest that such evidence must have been considered by the trial court as a matter of federal constitutional law.

13

Ward now contends that the refusal of the jury to find any of the remaining mitigating factors--the evidence of which, he notes, was uncontradicted--renders his sentence unconstitutional.

The Constitution requires that "the sentencer ... not refuse to consider or be precluded from considering any relevant mitigating evidence." Hitchcock v. Dugger, 481 U.S. 393, 394 (1987) (internal quotation marks omitted). The mere fact that a defendant offers certain evidence in mitigation, however, does not mean that the jury is required to assign any mitigating value to it. See Raulerson v. Wainwright, 732 F.2d 803, 807 (11th Cir. 1984) (concluding that under Eddings, "the Constitution prescribes only that the sentencer hear and consider all the evidence a defendant chooses to offer in mitigation" and that "[t]here is no requirement that the [sentencer] agree with the defendant's view that it is mitigating"); see also Graham v. Collins, 506 U.S. 461, 490 (1993) (Thomas, J., concurring) (arguing that the constitutional right to present mitigating evidence to the sentencer does not "mean that the decision whether to impose the death penalty must be based upon all of the defendant's evidence, or that such evidence must be considered the way the defendant wishes"); Walton v. Arizona, 497 U.S. 639, 650 (1990) (opinion of White, J.) (refusing "to adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated them by a preponderance of the evidence"). Accordingly, the Supreme Court of North Carolina did not rule unreasonably or contrary to law in rejecting this claim. See 28 U.S.C.A. § 2254(d)(1).

E.

During cross-examination of Ward's mother regarding her knowledge of Ward's previous convictions, Ward stood and engaged in a protracted outburst toward the district attorney and the trial court. During the ensuing moments, the jury was removed from the courtroom and Ward was placed in handcuffs. The record does not clearly reveal, however, which of these events occurred first. Ward asserts that the jury was still present in the courtroom when he was seized and handcuffed and maintains that this action violated his constitutional rights. See Illinois v. Allen, 397 U.S. 337, 344 (1970) (stating

14

that "no person should be tried while shackled and gagged except as a last resort").

We conclude that the state habeas court did not rule unreasonably in rejecting this claim.[7] By Ward's own account of the incident, he "lost [his] temper and stood up at the counsel table and started shouting at [the district attorney], including using some profanity." J.A. 75. Ward also acknowledges that he "was emotionally upset, and may have been pacing back and forth restlessly." Id. Although Ward maintains that this conduct did not justify his being restrained in view of the substantial prejudice that may result from such tactics, we cannot say that "reasonable jurists would all agree" that the state habeas court ruled unreasonably in reaching a different conclusion. Green, 143 F.3d at 870.

F.

Ward next raises two challenges to the proportionality review conducted by the Supreme Court of North Carolina. First, Ward maintains that the imposition of the death penalty in his case violates the Eighth Amendment because there is no meaningful way of distinguishing his case from other, similar cases in which the death penalty was not imposed. Second, Ward claims that the structure of proportionality review in North Carolina is inherently flawed, again in violation of the Eighth Amendment. Because the Eighth Amendment does not require proportionality review of a death sentence, see Pulley v. Harris, 465 U.S. 37, 50-51 (1984),[8] these claims are not cognizable in a federal habeas corpus proceeding. See Buchanan v. Angelone, 103 F.3d 344, 351 (4th Cir. 1996), aff'd, 118 S. Ct. 757 (1998).

_____

[7] As with the issue discussed in Part IV regarding the seating of the victim's husband, the state habeas court incorrectly stated that this claim had been raised and decided on direct appeal, but also independently found the claim to be without merit. We therefore review the conclusion of the habeas court concerning the merits of the claim.

[8] The Pulley court acknowledged the possibility of "a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review." Id. at 51. Ward does not contend, however, that the North Carolina death penalty scheme falls into this category.

15

VII.

Ward further argues that his attorneys were constitutionally inef-
fective for failing to develop expert testimony regarding his impaired
capacity due to drug usage. Although counsel presented the testimony
of Dr. Lara, Ward maintains that counsel should have retained another
expert whose testimony would have been more compelling. In order
to succeed on this claim, Ward must establish that his attorneys' "rep-
resentation fell below an objective standard of reasonableness" and
"that there is a reasonable probability that, but for counsel's unprofes-
sional errors, the result of the proceeding would have been different."
Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Review of
counsels' actions is "highly deferential." Id. at 689.

Although Ward asserts that another expert might have been more
effective than Dr. Lara in presenting a claim of diminished capacity,
Ward points to no evidence that was not considered by Dr. Lara and
presented to the jury. Under these circumstances, we cannot say that
the state habeas court unreasonably applied the Strickland standard in
rejecting Ward's ineffectiveness claim. See Poyner v. Murray, 964
F.2d 1404, 1419 (4th Cir. 1992) (explaining that the Constitution does
not require attorneys to "shop around" for more favorable expert testi-
mony).

VIII.

Ward next challenges the adequacy of proceedings concerning his
motion for appropriate relief, contending that the state habeas court
denied him due process by failing to hold an evidentiary hearing.
Ward does not dispute that the Constitution does not require states to
provide habeas review of convictions, but maintains that the election
of a state to provide such review creates a due process right to consis-
tent administration of the review scheme. Even if this is true, Ward
has suffered no deprivation of due process because nothing in the stat-
ute setting forth procedures for consideration of motions for appropri-
ate relief mandates the holding of an evidentiary hearing in all cases.
See N.C. Gen. Stat. § 15A-1420(c)(1) (1997) ("Any party is entitled
to a hearing on questions of law or fact arising from the motion ...
unless the court determines that the motion is without merit." (empha-
sis added)). Here, the state habeas court determined that each of

16

Ward's claims would be without merit even if the facts alleged by Ward were taken as true. Under North Carolina law, no evidentiary hearing was required. See State v. McHone, 499 S.E.2d 761, 763 (N.C. 1998) (holding that habeas court is not required to hold evidentiary hearing on a claim when it involves only a question of law or when, taking disputed facts in the light most favorable to the petitioner, the claim is without merit).

IX.

Finally, Ward presents three additional claims, all of which we conclude are procedurally defaulted: that the imposition of the death penalty by the jury was improperly based on emotion and thus violated the Eighth Amendment; that the jury viewed Ward in handcuffs and shackles during a large portion of the sentencing phase, in violation of the Sixth and Fourteenth Amendments; and that the evidence was constitutionally insufficient to support a finding that the murder was committed for pecuniary gain.

Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).**9**

Ward's claim that the jury was influenced by emotion in returning a sentence of death is premised on numerous asserted errors--"a crying outburst by [the] victim's husband, an outburst by [the] defendant leading to him being handcuffed and shackled before the jury, the district attorney's excessive emphasis on the victim in argument, and [the] district attorney's improper arguments appealing to the jury's

_____

**9** Ward makes no attempt to establish cause and prejudice or a fundamental miscarriage of justice to excuse his defaults, and therefore we do not consider whether either exists. See Gilbert v. Moore, 134 F.3d 642, 656 n.10 (4th Cir. 1998) (en banc), cert. denied , ___ U.S.L.W. ___ (U.S. Oct. 5, 1998) (Nos. 97-9198, 97-9264).

17

emotions." Brief of Appellant at 54. The state habeas court concluded that while Ward had presented the component parts of his claim on direct appeal, the present claim--resting on the cumulative effect of these allegedly prejudicial occurrences--had not been raised. The state habeas court also determined that Ward failed to present on direct appeal his claims regarding his continued presence in front of the jury in handcuffs and shackles[10] and the sufficiency of the evidence supporting the aggravating factor. The state habeas court therefore defaulted all of these claims. See N.C. Gen. Stat. § 15A-1419(a)(3) (1997). Accordingly, we decline to consider them.[11]

X.

For the reasons set forth above, we conclude that all of Ward's claims either lack merit or are procedurally defaulted. We therefore affirm the denial of habeas relief by the district court.

AFFIRMED

_____

[10] Ward concedes that he did not raise on direct appeal a claim related to his continued presence before the jury in handcuffs and shackles, but maintains that this issue was subsumed within the ruling of the Supreme Court of North Carolina on his challenge to the denial of a motion for mistrial based on potential tainting of the jury resulting from his outburst. This assertion is patently without merit. Although the Supreme Court of North Carolina noted in the course of its narrative describing the events leading to the motion for mistrial that the trial court ordered that Ward remain in handcuffs and shackles, nothing in its review of the denial of the motion for mistrial can be understood as passing upon the propriety of the continued use of restraints.

[11] Ward points out that the district court considered his second claim on its merits, evidently believing that we are somehow bound to do the same. We conclude, however, that the district court erred in failing to rule that Ward defaulted the claim.