PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOHN WESLEY JONES,
             *Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison,
             *Respondent-Appellee.*

No. 04-13

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CA-00-427-5-F-HC)

Argued: November 30, 2004

Decided: March 14, 2005

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Widener joined. Judge Michael wrote an opinion dissenting in part and concurring in part.

---

## COUNSEL

**ARGUED**: Daniel Kanin Shatz, Durham, North Carolina, for Appellant. Steven Franklin Bryant, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Jennifer Harjo, SMITH, SMITH & HARJO, Wilmington, North Carolina, for Appellant. Roy Cooper,

Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

John Wesley Jones appeals from the dismissal of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (2000). Although the district court denied Jones[1] habeas relief, it granted a certificate of appealability on his claim that the state trial court had unconstitutionally excluded evidence of remorse at his sentencing hearing. In addition, we granted a certificate of appealability on Jones' claim that his trial counsel labored under an actual conflict of interest that affected his representation of Jones. Finding no basis for habeas relief, we now affirm the dismissal of Jones' habeas petition.

I.

In late July and August of 1990, Jones was tried in North Carolina state court for the murder of his adult son, Charles "Little John" Meadows. The parties do not dispute the underlying facts.

On September 23, 1989, Meadows was walking along a rural route in Jones County, North Carolina, with Joyce Hill, Nancy Hill, and Nancy Hill's child. At an intersection, they met Queen Jones, who was in her car with her children, Marissa Jones and Thomas Jones; her mother, Rena Jones; and her sister, Christine Jones. Queen Jones was looking for Joyce Hill to ask if she would babysit Marissa and Thomas. As Meadows and the Hills approached, Marissa, Thomas, and Christine began to exit the car.

Just then, Jones approached in his car. He passed through the intersection, turned his car around, and stopped on the side of the road.

---

[1]A number of participants in this case have the surname Jones. For clarity, we will refer to John Wesley Jones simply as "Jones" throughout; we will refer to others using their first names.

Jones got out of the car and pulled a shotgun from the back seat. Meadows, Christine, Marissa, and Thomas then clambered into the back seat of Queen Jones' car; Rena and Queen Jones remained in the front seats. Jones approached the car, loading his gun. When he reached the side of the car on which Meadows was sitting, he cocked the gun and fired through the car door. He then reloaded the gun, walked back to his car, and drove away. The shot hit Meadows in the chest, killing him; some of the buckshot injured Marissa Jones.

Louis Foy represented Jones in both the guilt and the penalty phases of the trial. Foy concurrently represented prosecution witness Joyce Hill in an unrelated domestic relations matter. At trial, Hill testified that after Jones shot Meadows, "he walked away like he shot a dog," and Foy did not extensively cross-examine her. Foy had not obtained a written waiver of any conflict of interest from Jones. Indeed, Foy is not certain that he told Jones of the concurrent representation.

Upon consideration of all of the testimony, the jury convicted Jones of first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, and discharging a firearm into occupied property.

In the penalty phase of the trial, the prosecution presented evidence of two aggravating factors: (1) Jones had previously been convicted of three felonies involving violence or the threat of violence, and (2) in the commission of Meadows' murder, he had knowingly created a great risk of death to more than one person (Meadows and Marissa Jones) by means of a weapon normally hazardous to the lives of more than one person.

Jones called eighteen witnesses to present evidence of mitigating circumstances. His initial witness was Jasper Jones, the grandfather of Marissa Jones. During Jasper Jones' testimony, the following exchange occurred:

> DEFENSE COUNSEL: Do you have an opinion as to whether John is sorry for what he did?
>
> JASPER JONES: That's what he told me.

PROSECUTOR:    Objection.

THE COURT:    That motion to strike is allowed. Objection is sustained. Ladies and gentlemen of the jury, disregard the witnesses [sic] last statement.

DEFENSE COUNSEL:    No further questions.

Forensic psychiatrist Dr. Billy W. Royal, appearing as a defense witness, read to the jury a letter written by Jones to his wife. The State objected on hearsay grounds. The court instructed the jury that it could consider the contents of the letter *only* "as an explanation of the basis" for Dr. Royal's opinion and not as substantive evidence. Dr. Royal then read Jones' letter: "I have always loved you very special as I have done Little John, but as life itself can be a mistake, I just made a great one. I know what Little John 'brother' meant to you." Jones did not attempt to introduce further evidence of remorse.

In his closing argument, the prosecutor referred to Jones' alleged lack of remorse, arguing that Jones neither cried nor attempted to help Meadows after the shooting. The prosecutor emphasized that the jury could not consider the letter from Jones that Dr. Royal read into the record as substantive evidence. And he reminded the jury that, although in his allocution Jones "may get up and tell you how sorry he is or how it has affected his name and himself and how I did not mean to do it," those statements would not be evidence.

At the close of the evidence, the court instructed the jury as to aggravating and mitigating circumstances and the jury deliberated for four hours without reaching a verdict before retiring for the day. The following day, after asking the court how many years constituted a life sentence and being told it could not consider such a matter, the jury informed the court that it could not reach a unanimous decision. The court then gave the jury an *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 501-02 (1896).

That afternoon, the jury returned a unanimous recommendation that Jones be sentenced to death. The jury found both of the aggravating factors urged by the prosecution; it also found that seven of the

eighteen factors presented by the defense had mitigating value. In response to the "catch-all" provision, under which the jury could have considered evidence of Jones' remorse (because remorse was not one of the seventeen specific mitigating factors), the jury indicated that no other circumstances arose from the evidence that one or more jurors deemed to have mitigating value. The court accepted the recommendation, and sentenced Jones to death.

Jones appealed, asserting in relevant part that the trial court erred at the sentencing hearing by excluding Jasper Jones' testimony that Jones had expressed remorse about the murder. The Supreme Court of North Carolina, relying *inter alia* on *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978), held that the exclusion was error. *See State v. Jones*, 451 S.E.2d 826, 847 (N.C. 1994). However, the court found that the error was "harmless beyond a reasonable doubt" "[i]n light of the . . . facts and the circumstances of the case as a whole," including the fact that "another witness" had read to the jury the letter from Jones to his wife "suggesting remorse and regret." *Id.* at 848.

After the Supreme Court of the United States denied Jones' petition for *certiorari*, *Jones v. North Carolina*, 515 U.S. 1169 (1995), and his subsequent petition for rehearing, *Jones v. North Carolina*, 515 U.S. 1183 (1995), Jones filed a Motion for Appropriate Relief (MAR) in state court. In the MAR he asserted, among other things, ineffective assistance of counsel because Foy failed to effectively cross-examine prosecution witness Joyce Hill, whom Foy was concurrently representing in an unrelated divorce action.

In support of his motion, Jones attached an affidavit from Foy, stating in relevant part:

> During the time leading up to Mr. Jones' trial, I felt that my representation of Ms. Hill would be to Mr. Jones' advantage in that it gave me the opportunity to discuss with Ms. Hill the events which she had witnessed. I thought this would enable me to be better prepared to cross examine Ms. Hill and bring out evidence favorable to Mr. Jones. I was shocked when Ms. Hill, on direct examination, testified that Mr. Jones walked away from the shooting looking as if he

had just shot a dog. This was so unexpected, based on my conversations with Ms. Hill that I was completely taken aback. I became leery of anything that Ms. Hill might have to say. This affected the scope of my cross examination of Ms. Hill.

The MAR court denied the motion and refused to order an evidentiary hearing on any of his claims. Regarding Foy's asserted conflict of interest, the court found that Jones had "failed to produce any information favorable to [him] within the knowledge of Ms. Hill which should have been elicited" by Foy in cross-examination, and that Jones had failed to show that "Foy represented an interest which actually conflicted with that of [Jones]."[2]

## II.

On June 29, 2000, Jones filed a petition for a writ of habeas corpus in federal court. He argued that, as the state supreme court found, the trial court erred in preventing Jasper Jones from testifying about Jones' remorse, but that the state supreme court's ruling that the error was harmless constituted an unreasonable application of *Chapman v. California*, 386 U.S. 18 (1967). Jones also asserted that his trial counsel had an actual conflict of interest that hindered his performance, and that the MAR court's adjudication of this claim was an unreasonable application of *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and *Strickland v. Washington*, 466 U.S. 668 (1984).

The district court dismissed the petition and denied the request for an evidentiary hearing. The district court concluded, contrary to the Supreme Court of North Carolina, that the state trial court had not erred in excluding Jasper Jones' statement. The district court also

---

[2]Upon consideration of Jones' petition for a writ of *certiorari* to the MAR court, the Supreme Court of North Carolina remanded the case for an evidentiary hearing on Jones' claim that he had not voluntarily waived his right to testify. The MAR court held an evidentiary hearing on the issue. Jones subsequently filed a motion to amend his MAR based on evidence adduced at the evidentiary hearing. The court denied both the motion to amend and the claim presented to it. The Supreme Court of North Carolina denied Jones' subsequent petition for a writ of *certiorari*.

found Jones' conflict of interest claim unavailing because Jones had "failed to demonstrate an actual conflict." Analyzing the claim as one of ineffective assistance of counsel under *Strickland*, the court found that Jones had failed to establish prejudice due to the ineffective assistance. The district court refused Jones' request for an evidentiary hearing on this claim.

However, the district court granted a certificate of appealability on Jones' claim that the state court improperly excluded evidence of remorse. This court granted a certificate of appealability on Jones' conflict of interest claim. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") tightly circumscribes our review of both of these claims. That statute provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

With these facts and AEDPA's stringent standard of review in mind, we consider Jones' contentions.

### III.

First, Jones argues that the state trial court committed constitutional error in excluding evidence of remorse from his sentencing hearing and that this error was not harmless.

A.

We agree with the Supreme Court of North Carolina that the state trial court erred in excluding Jasper Jones' testimony. *Lockett*, *Eddings*, and *Skipper v. South Carolina*, 476 U.S. 1 (1986), require this conclusion.

In *Lockett*, the trial judge sentenced the defendant to death under a statute that provided for imposition of the death penalty unless the sentencer found, by a preponderance of the evidence, the existence of at least one of three enumerated mitigating factors. *Lockett*, 438 U.S. at 593-94. Lockett argued her sentence was unconstitutional because the state statute prohibited the sentencer from considering other relevant mitigating factors. *Id.* at 602. The Supreme Court agreed, holding that, in capital cases, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604.

In *Eddings*, the Supreme Court reaffirmed and extended this rule. The trial judge had refused to consider mitigating evidence of a convicted murderer's unhappy and violent upbringing. The Court held, "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 113-14. Indeed, the Court likened the situation to one, similar to that at hand, in which "the trial judge had instructed a jury to disregard the mitigating evidence . . . proffered on [the defendant's] behalf," emphasizing that the sentencer may not give relevant mitigating evidence "no weight by excluding [it] from . . . consideration." *Id.* at 114-15.

More recently, in *Skipper*, the trial court permitted the defendant to introduce evidence at his capital sentencing hearing of mitigating factors, such as his difficult upbringing, but excluded as irrelevant evidence of the defendant's good behavior during the seven-and-one-half months he was in jail awaiting trial. *Skipper*, 476 U.S. at 2-3. Determining that the evidence of good behavior was, indeed, relevant, the Supreme Court held that the exclusion "impeded the sentencing

jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender," and required reversal of the death sentence. *Id.* at 8-9.

The "central requirement" of *Lockett* and its ensuing line of cases is that "a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (internal quotation marks and citation omitted). Nor may a court apply hearsay rules "mechanistically to defeat the ends of justice" at a capital sentencing. *Green v. Georgia*, 442 U.S. 95, 97 (1979) (internal quotation marks and citation omitted).

The state trial court failed to follow this "central requirement" in the case at hand. When Jasper Jones attempted to testify that, before trial, Jones had expressed remorse for his actions, the trial court sustained the State's hearsay objection. At oral argument before us, the State conceded that in doing so, the trial court excluded relevant, admissible mitigating evidence.

That concession is well-taken. The Supreme Court recently reasserted that, when considering mitigating evidence in capital cases, a court must define relevance in "the most expansive terms"; evidence is relevant "if the sentencer could reasonably find that it warrants a sentence less than death." *Tennard v. Dretke*, 124 S.Ct. 2562, 2570 (2004) (internal quotation marks and citation omitted). In excluding Jasper Jones' testimony, the trial court precluded the jury from considering relevant, admissible evidence of Jones' remorse in contravention of the "central requirement" of *Lockett* and its progeny. Accordingly, we must determine whether the error entitles Jones to habeas relief.

B.

The Supreme Court of North Carolina believed this error to be harmless because the jury had the benefit of other evidence of Jones' remorse, that is, Jones' letter to his wife, which Dr. Royal read to the jury. *Jones*, 451 S.E.2d at 848. However, the state trial court specifi-

cally instructed the jury that it could not consider the letter as substantive evidence. The law assumes that, except in extraordinary circumstances, jurors follow a court's instructions. *See, e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Thus, we must conclude that in excluding Jasper Jones' testimony, the trial court excluded the *only* substantive evidence of remorse. Accordingly, the rationale for the state court's harmlessness ruling fails.

We cannot disturb the state's harmlessness ruling, however, unless the conclusion that the error was harmless — as opposed to the rationale for that conclusion — constituted an unreasonable application of *Chapman*. We must decide whether it was unreasonable for the state supreme court to determine that the State had "prove[d] beyond a reasonable doubt that the [exclusion of the evidence] did not contribute to the [sentencing recommendation]." *Chapman*, 386 U.S. at 24. Put another way, we must decide whether the state court unreasonably determined that the sentencing recommendation "actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis omitted).

In this case, we think that the state supreme court did rule unreasonably that the exclusion of the evidence was harmless beyond a reasonable doubt. By erroneously excluding Jasper Jones' evidence of remorse, the trial court removed from the jury's consideration all evidence of remorse, an important mitigating factor. *See Atkins v. Virginia*, 536 U.S. 304, 320-21 (2002) (noting that one reason for a "categorical rule making [mentally retarded] offenders ineligible for the death penalty" is that "their demeanor may create an unwarranted impression of lack of remorse for their crimes"); *Riggins v. Nevada*, 504 U.S. 127, 144 (1992) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.") (Kennedy, J., concurring).

Furthermore, the State emphasized the lack of remorse in its closing argument. And the jury found the question of whether to impose the death penalty so close that it had difficulty reaching its recommendation: at one point, the jury foreman informed the judge that the jurors were "beating [their] head[s] against the wall," and the jury required an *Allen* charge before it reached its recommendation. Given

the actual conduct of the sentencing proceeding, including the utter elimination of potentially important remorse evidence from the capital sentencing hearing, it was unreasonable for the state court to determine that the jury's recommendation of the death sentence was "surely unattributable" to the exclusion of the remorse evidence. *Sullivan*, 508 U.S. at 279.

Having found that the Supreme Court of North Carolina unreasonably applied *Chapman*, we review Jones' claim *de novo. Rose v. Lee*, 252 F.3d 676, 689-90 (4th Cir. 2001); *Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003); *cf. Medina v. Hornung*, 386 F.3d 872, 877-78 (9th Cir. 2004) (holding that "even if the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, habeas relief may still be denied absent a showing of prejudice"); *Saiz v. Burnett*, 296 F.3d 1008, 1012 (10th Cir. 2002) (same).[3] As mentioned earlier, we agree that the trial court erred in excluding Jones' sole evidence of remorse. However, we cannot grant Jones a writ of habeas corpus unless the error was not harmless, and, on collateral review, we must apply a more stringent harmless error standard than the *Chapman* standard. *See Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002). The Supreme Court applied this heightened standard, derived from *Kotteakos v. United States*, 328 U.S. 750 (1946), to federal habeas cases in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and clarified it in *O'Neal v. McAninch*, 513 U.S. 432 (1995). Under this standard, the habeas petitioner will be entitled to relief only if a habeas court is "in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 436 (internal quotation marks and citation omitted). The proper inquiry is not "merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos*, 328 U.S. at 765.

---

[3]We note that the Second Circuit, in contrast, has held that once a petitioner has shown that the state court decision upholding his conviction is contrary to, or an unreasonable application of, Supreme Court precedent, such as *Chapman*, the petitioner is entitled to a writ of habeas corpus without also having to withstand *de novo* review of his claim. *Zappulla v. New York*, 391 F.3d 462, 467, 475 (2d Cir. 2004).

This is a more demanding standard than that set forth in *Chapman*, and is born of respect for the finality of state court convictions "that have survived direct review," and concerns of comity, federalism, and the relitigation of claims on collateral review. *See Brecht*, 507 U.S. at 635. In analyzing whether error is harmless under this standard, we must look to "the impact of the thing done wrong . . . in the total setting." *Kotteakos*, 328 U.S. at 764. Applying this standard, we cannot say that the exclusion of Jasper Jones' testimony that Jones expressed remorse had the "substantial and injurious effect" necessary for a federal court to grant habeas relief.

As outlined above, the sentencing jury unanimously found both of the aggravating factors urged by the State: that, in the commission of Meadows' murder, Jones had knowingly created a great risk of death to more than one person by means of a weapon normally hazardous to the lives of more than one person, and that he had previously been convicted of a felony involving violence or the threat of violence. The evidence presented at the guilt phase of the trial regarding the facial injuries sustained by six-year-old Marissa Jones from the shooting of Meadows certainly established the first factor beyond dispute.

Moreover, the State presented evidence of three brutal crimes that Jones had previously been convicted of committing. Johnnie Jones testified that in April 1973, he and Jones had a fistfight, after which Johnnie Jones left the scene and went to his brother's house. As Johnnie Jones and his brother were leaving the house, Jones shot Johnnie Jones in the right knee with a semi-automatic twenty gauge shotgun; Jones then shot Johnnie Jones in the left knee; Jones then approached, put the shotgun in Johnnie Jones' face, and pulled the trigger again, but the gun jammed. As a result, Johnnie Jones lost his left leg and sustained nerve damage to his right, resulting in his inability to perform his job as a truck driver. Jeffrey Fitzgerald testified that on September 4, 1977, Jones and an associate used a gun to rob the convenience store where Fitzgerald worked. Herman Jones testified that on September 5, 1977, Jones shot him in the shoulder without provocation. Jones pled guilty to all three of these crimes.

Jones attempted to counterbalance this substantial aggravating evidence by presenting mitigating evidence from various friends, relatives, some-time colleagues, and a forensic psychiatrist. They testified

that Jones volunteered in the community, both by participating in a Head Start program and by using his masonry and automotive repair skills to help others; that he was a good worker and had done well in school; that he provided for his family; that he drank excessively, and when he drank, his personality changed; and that he was drunk on the night of the murder. Dr. Royal testified that Jones was an alcoholic with chronic hypertension and that he displayed signs of paranoia; that he needed treatment for these conditions; and that he was intoxicated, under mental and emotional stress, and unable to conform his conduct to that of a normal person when he killed Meadows.

At least one member of the jury credited some of this evidence, and the jury found that Jones had established seven of eighteen mitigating circumstances: that the murder was committed while Jones was under the influence of mental or emotional disturbance; that he supported his family and his wife could spend her money as she wanted; that he worked all of his adult life, except while he was incarcerated; that, at the time of the murder, he needed treatment for alcoholism and/or emotional disturbance; that he had played a prominent role in assisting with a Head Start program; that he had built fireplaces for four community residents; and that he carried firewood during the winter for an acquaintance's household. However, the jury also determined that these mitigating factors did not outweigh the aggravating factors counseling them to sentence Jones to death.

We cannot hold that the omission of Jasper Jones' evidence from this hearing had a substantial and injurious effect on the outcome of the sentencing proceedings. We know only that Jasper Jones would have testified that Jones told him that he was sorry for what he did. Defense counsel made no other proffer as to what Jasper Jones' testimony would have been. Given the strength of the aggravating evidence — testimony from the victims of Jones' former crimes, Jones' guilty pleas to those crimes, and testimony that the jury had clearly credited at the guilt phase of the trial showing that Jones had put young Marissa Jones in danger when he shot the gun into the back of the car to kill Meadows — and the relative weakness of the excluded evidence of remorse, we are not in grave doubt that its omission had any substantial effect on the outcome of the sentencing proceedings.

IV.

Jones' remaining habeas claim involves his attorney's alleged con-
flict of interest. Jones maintains that his trial counsel, Louis Foy,
operated under an unconstitutional conflict of interest by representing
a prosecution witness, Joyce Hill, in an unrelated matter while he rep-
resented Jones. Jones asserts that, because of this conflict, Foy did not
vigorously cross-examine Hill during the guilt phase of Jones' trial,
entitling him to habeas relief under *Cuyler*. Alternatively, he asserts
that he is, at the very least, entitled to an evidentiary hearing on this
claim.

A.

Under *Cuyler*, prejudice is presumed, and a petitioner is entitled to
relief, if he shows that his counsel labored (1) under an actual conflict
of interest that (2) adversely affected the representation. 446 U.S. at
350; *see also Mickens v. Taylor*, 535 U.S. 162, 166, 171 (2002);
*Strickland*, 466 U.S. at 692. To demonstrate an actual conflict, a peti-
tioner "must show that [his] interests 'diverge[d] [from his attorney's]
with respect to a material factual or legal issue or to a course of
action.'" *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998) (en
banc) (quoting *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring
in part and dissenting in part)) (second alteration in original). Even if
a petitioner establishes an actual conflict, he cannot succeed on his
claim unless he also can show that the conflict adversely affected the
attorney's representation, such as when an attorney takes action for
one client that is necessarily adverse to another, or when an attorney
fails to take action for one client for fear of injuring another. *Id.*

Analysis of claims of actual conflicts of interest frequently do not
proceed in two distinct steps; rather "[t]he two requirements . . . are
often intertwined." *United States v. Tatum*, 943 F.2d 370, 375 (4th
Cir. 1991); *see also Mickens*, 535 U.S. at 171 (stating that an "actual
conflict of interest" means "a conflict *that affected counsel's perfor-
mance* — as opposed to a mere theoretical division of loyalties"). So
it was here. Without examining the first and second requirements sep-
arately, the MAR court simply found that Jones had "failed to show"
that Foy's representation of Joyce Hill in an unrelated domestic rela-
tions matter "actually conflicted with that of" Jones. The court

pointed out that there was no evidence that Hill had previously said something to Foy with which Foy could have impeached her and that the existence of such inconsistent statements was unlikely because Hill's testimony was fully consistent with Queen Jones' testimony.[4] We do not believe that in so finding the MAR court unreasonably determined the facts, or unreasonably applied or acted contrary to *Cuyler*.

Jones does offer persuasive arguments that Foy's concurrent representation of Jones and Hill constituted an "actual conflict," satisfying the first prong of *Cuyler*. But even if we assume, without deciding, that Foy operated under an actual conflict, Jones is not entitled to relief because he has failed to show that Foy's representation of Hill affected Foy's performance during Jones' trial.

Jones maintains that Foy's affidavit "impl[ies]" that Hill made statements to Foy prior to trial that were "inconsistent" with her trial testimony; that Foy did not cross-examine Hill about her "inconsistent" statements; and that Foy's surprise at Hill's "inconsistent" testimony affected the scope of his cross-examination. Brief of Petitioner at 39. However, Foy's affidavit does not actually state that Hill's trial testimony was inconsistent with her pretrial comments to Foy about the case. Rather, it notes only that, based on his prior conversations with Hill, Foy was "completely taken aback" by Hill's trial testimony, which was "so unexpected." At most, Jones has demonstrated that Foy had not previously heard Hill say that Jones had "walked away like he shot a dog" or something similar. This simply does not establish, as Jones claims, that Foy was privy to information with which he could have impeached Hill.

Jones' only other evidence that the dual representation adversely affected Foy's representation of Jones is the length of Foy's cross-examination of Hill. He points out that Foy's cross-examination of Hill consists of less than six pages of trial transcript. However, Foy's

---

[4]The MAR court then proceeded to analyze the claim as one of ineffective assistance of counsel under *Strickland* and found that Jones had not met "either the prejudice component or the performance component" of *Strickland*. Jones does not contend before this court that he is entitled to relief under *Strickland*.

co-counsel conducted the cross-examination of Queen Jones, who was also an eyewitness to the shooting and testified to essentially the same facts as Hill did, and that cross-examination consists of less than three pages of trial transcript. Thus, to the extent that Jones suggests that the length of Foy's cross-examination is evidence of his conflict of interest, we are unconvinced.

Moreover, Foy has stated under oath that he abbreviated his cross-examination of Hill for strategic reasons that, in his estimation, were in Jones' best interest. He explains that he limited his questioning of Hill *because* her testimony that Jones "walked away like he shot a dog" made Foy "leery" of what Hill might say on cross-examination. This explanation of trial strategy undermines Jones' claim that it was Foy's representation *of Hill* that caused him to limit his cross-examination of her. Rather, Foy's choice to limit his cross-examination seems to have been motivated by a desire to stanch the flow of testimony by Hill that *damaged Jones*.[5] And Jones has proffered no evidence that Foy failed to impeach Hill for fear of injuring her interests or Foy's own interests.

Certainly, there is no question that this concurrent representation was exceedingly ill-advised. But the notion that Foy's solicitude for Hill caused him to limit his cross-examination is contradicted by Foy's own affidavit, the only evidence offered by Jones in support of his claim. Thus, Jones has not demonstrated that the MAR court's denial of his conflict of interest claim constituted an unreasonable determination of the facts or a decision contrary to, or involving an unreasonable application of, Supreme Court precedent.

## B.

Jones also challenges the district court's denial of his request for an evidentiary hearing on his conflict of interest claim. We review the

---

[5]In fact, the length and content of Foy's cross-examination of Hill does not seem unreasonable given that, moments before, in her direct examination, she had given extremely graphic and emotional testimony about the details of the crime. She had been reduced to tears, leading Foy to ask the court for a recess so that she could collect herself.

denial for an abuse of discretion. *Hill v. Ozmint*, 339 F.3d 187, 193 (4th Cir. 2003).

To obtain an evidentiary hearing, a habeas petitioner must establish one of six factors outlined by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963):

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Fulwood*, 290 F.3d at 681 & n.7. Even if one of these criteria is met, a federal habeas court "is permitted to hold [an evidentiary] hearing only if the petitioner alleges additional facts that, if true, would entitle him to relief." *Id.* at 681 (internal quotation marks and citation omitted). Thus, an evidentiary hearing is an instrument to test the truth of facts already alleged in the habeas petition. *See, e.g.*, *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 291 (3d Cir. 1991) ("First, we must determine whether the petitioner has alleged facts that, if proved, would entitle him to relief. If so, we must then decide whether an evidentiary hearing is necessary to establish the truth of those allegations.").

While Jones' allegations follow the general contours of a conflict of interest claim, he has not met his burden of alleging facts that, if true, would demonstrate that Foy's representation of Hill adversely affected Foy's representation of Jones. Rather, he provides factual support only for his allegation that Foy thought that his representation of Hill would benefit Jones because it gave Foy an opportunity to talk to Hill about the case prior to trial and that Foy was shocked and surprised by Hill's trial testimony and therefore constrained his cross-examination. These facts, if true, establish merely that Foy's representation of Hill gave Foy an opportunity to speak with Hill about Jones' case and that these pre-trial conversations were the basis for Foy's surprise at Hill's trial testimony. They do not establish that Hill's trial

testimony was inconsistent with prior statements she had made to Foy, with which he could have impeached her. The alleged facts also fail to show that Foy's representation of and concern for Hill were the reason he did not cross-examine her more rigorously.

Indeed, Jones admits that the factual allegations of his claim are "undeveloped." Reply Brief at 23. Nonetheless, he does not seek to develop them by deposing Foy or conducting other discovery. Rather, he contends that the allegations outlined above "are sufficient to support a reasonable inference that more specific factual detail concerning Ms. Hill's inconsistent statements to Foy exists and could be brought out at an evidentiary hearing." *Id.* at 22-23. However, absent factual allegations — not mere inferences — that Hill had made inconsistent statements to Foy with which he could have impeached her, Jones is not entitled to an evidentiary hearing because, without such allegations, he has failed to assert facts that, if true, would entitle him to relief.[6]

---

[6]We do not require *direct* factual support for each allegation a petitioner wishes to prove at a hearing. *Cf. post* at 24-25. Rather, we hold only that to obtain an evidentiary hearing, the petitioner must rely on more than merely plausible inferences that there is a factual basis for his claim for relief. Contrary to the dissent's suggestion, the cases on which it relies have granted evidentiary hearings only when the petitioner has made such a showing. *See Hall v. United States*, 371 F.3d 969, 972-73 (7th Cir. 2004) (petitioner provided evidence that before trial his counsel told the government, but not the petitioner himself, that during counsel's representation of a potential prosecution witness, he had learned information pertaining to the petitioner's offense, which created an "obvious conflict" if the witness testified, and that the lawyer subsequently urged petitioner to plead guilty to avoid this testimony); *Siripongs v. Calderon*, 35 F.3d 1308, 1312-13 (9th Cir. 1994) (petitioner provided detailed expert affidavits and the deposition of trial counsel admitting that, although he believed petitioner had not acted alone and trial evidence indicated others took part in the crime, he had been "distracted" during the trial and had failed to investigate the possibility of accomplice involvement); *Porter v. Wainwright*, 805 F.2d 930, 933 (11th Cir. 1986) (petitioner "proffered a number of exhibits," including affidavits from fact and expert witnesses, of mitigating evidence that counsel "could have, but failed to present" at his capital sentencing hearing). Other courts require even more. *See, e.g.*, *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002) ("[I]n order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations beyond mere unsupported assertions.") (internal quotation marks and citation omitted).

Jones presents only conclusory and speculative allegations as support for his request for an evidentiary hearing. Such allegations do not trigger the right to a hearing. For example, in *Enoch v. Gramley*, 70 F.3d 1490, 1495-98 (7th Cir. 1995), the petitioner claimed that his attorney's prior unrelated representation of Proctor, a key prosecution witness, created an actual conflict of interest that affected the representation. Enoch charged that his attorney faced "divided loyalties in cross-examining Proctor" because the attorney had to protect Proctor's privileged communications and because the attorney had an interest in representing Proctor in future matters. *Id.* at 1497. The Seventh Circuit found that these allegations were "no more than conclusions and speculation" and did not entitle Enoch to an evidentiary hearing. *Id.* at 1498-99. Here, Jones has made similarly speculative and vague allegations. He must do more to obtain an evidentiary hearing on a habeas claim in federal court.

Thus, the district court did not abuse its discretion in refusing to conduct an evidentiary hearing.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

MICHAEL, Circuit Judge, dissenting in part and concurring in part:

John Wesley Jones is entitled to an evidentiary hearing to pursue his claim that when he was tried and sentenced to death for murder, his lawyer, who was also representing a key prosecution witness, had a conflict of interest that adversely affected his defense. The witness testified that when Jones killed his son with a shotgun blast, "[h]e walked away like he shot a dog." J.A. 20. This unchallenged statement told the jury that Jones was cold-blooded, heartless, and without feeling. It was powerful testimony in a case where the prosecution was seeking the death penalty based in part on the argument that Jones showed no remorse. Jones's lawyer did nothing to impeach this witness (his client in an unrelated case), even though there is a reasonable inference that she made statements helpful to Jones in her

pretrial conversations with the shared lawyer. There is a decent chance, I believe, that Jones can prove — if he is granted an evidentiary hearing — that his lawyer pulled his punches in cross-examining the witness due to the conflict of interest. With such a showing, Jones could establish his ineffective assistance of counsel claim and obtain a writ of habeas corpus. Because the majority denies Jones the evidentiary hearing, and I would grant it, I respectfully dissent from part IV of the court's opinion. I otherwise concur.

I.

When John Wesley Jones was tried for murder in North Carolina state court, his lead lawyer, Louis Foy, was also representing a key prosecution witness, Joyce Hill, in her unrelated divorce case. Foy, who was court appointed, did not inform Jones of the conflict. In an affidavit filed in connection with Jones's motion for appropriate relief (MAR) in state court, Foy said that he "felt that [his] representation of Ms. Hill would be to Mr. Jones' advantage in that it gave [Foy] the opportunity to discuss with Ms. Hill the events which she had witnessed." J.A. 417. This, Foy thought, "would enable [him] to be better prepared to cross examine Ms. Hill *and bring out evidence favorable to Mr. Jones*." *Id.* (emphasis added). Things did not turn out that way. As noted above, Hill testified on direct examination that after Jones killed the victim, "[h]e walked away like he shot a dog." J.A. 20. This testimony "shocked" Foy because it was "so unexpected, based on [his prior] conversations with Ms. Hill." J.A. 417-18. According to Foy, Hill's damaging and unexpected testimony about Jones's demeanor made him leery, and he limited the scope of his cross-examination. He made no attempt to impeach Hill — who was also his client — by cross-examining her about her prior statements that might have been favorable to Jones.

In his state MAR Jones alleged ineffective assistance of counsel on the ground that "Foy had a serious conflict of interest in representing both John Wesley Jones and Ms. Hill and then in attempting to cross-examine Ms. Hill." J.A. 408. The MAR court denied Jones's request for an evidentiary hearing, yet found that Jones (1) "failed to produce any information favorable to [him] within the knowledge of Ms. Hill which should have been elicited [on] cross-examination" and (2) "failed to show" that Foy was laboring under a conflict of interest.

J.A. 429-30. The court then held that Jones did not prove ineffective assistance of counsel under the standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding that an ineffective assistance of counsel claim is established by showing "[1] that counsel's performance was deficient" and "[2] that the deficient performance prejudiced the defense"). The North Carolina Supreme Court denied Jones's petition for a writ of certiorari.

## II.

The MAR court reached its decision without applying *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which sets forth the standard for determining ineffective assistance in a conflict of interest situation. As the majority states: "Under *Cuyler*, prejudice is presumed, and a petitioner is entitled to relief, if he shows that his counsel labored (1) under an actual conflict of interest that (2) adversely affected the representation." *Ante* at 14 (citing *Cuyler*, 446 U.S. at 350). A lawyer labors under an actual conflict with his client when "their interests diverge with respect to a material factual or legal issue or to a course of action." *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998) (en banc) (internal quotation marks and alteration omitted).

### A.

Jones has shown that Foy had an actual conflict of interest. "[C]ourts have generally adopted a prima facie prophylactic rule which prohibits attorneys from *simultaneously representing* clients with adverse interests, even in unrelated matters." Marc I. Steinberg & Timothy U. Sharpe, *Attorney Conflicts of Interest: The Need for a Coherent Framework*, 66 Notre Dame L. Rev. 1, 3 (1990) (emphasis added). The Model Rules of Professional Conduct reflect this approach and provide that "[a] lawyer shall not represent a client if the representation involves a concurrent conflict of interest . . . [unless, among other things,] each affected client gives informed consent, confirmed in writing." Model Rules of Prof'l Conduct R. 1.7(b) (2003). Foy was obligated to do his best to defend Jones against the charge of murder, yet Foy needed to remain loyal to and maintain good relations with Hill, who was also his client, albeit in another case. This was an intolerable situation because it was against Foy's interest to conduct a rigorous cross-examination of Hill, and it was

against Hill's interest to have her veracity as a witness discredited. Jones, on the other hand, was entitled to a lawyer who could decide how to cross-examine Hill without worrying about whether she would be offended. Foy, in short, was "actively represent[ing] conflicting interests." *Mickens v. Taylor*, 535 U.S. 162, 175 (2002) (quoting *Cuyler*, 446 U.S. at 350).

## B.

Jones contends that he has also shown that Foy's conflict adversely affected his cross-examination of Hill. Foy admits, in his affidavit, that (1) he believed his attorney-client relationship with Hill "would enable [him] to . . . bring out evidence favorable to Mr. Jones" when he cross-examined Hill; (2) before Hill testified, he had "the opportunity to discuss with [her] the events which she had witnessed;" (3) he was "shocked" and "completely taken aback," however, when Hill testified on direct that Jones "walked way [from the killing] like he shot a dog;" and (4) "[t]his was so unexpected [by Foy], based on [his prior] conversations with Ms. Hill" that it "affected the scope of [his] cross examination." J.A. 417-18; *see also* J.A. 20. These statements by Foy are undisputed. It is also undisputed that Foy did not attack Hill's credibility or attempt to impeach her with her prior statements. According to Jones, this demonstrates that Hill's pretrial conversations with Foy were inconsistent with her trial testimony and that this inconsistency affected Foy's cross-examination. Foy's affidavit supports the reasonable inference that he was shocked because Hill's statements were inconsistent and that Foy did not confront her with the inconsistencies because she was also his client. But, as the majority notes, Foy has not disclosed the content of his pretrial conversations with Hill, and he has not explicitly stated that Hill's statements were inconsistent. *Ante* at 18. Thus, it is also possible to infer that the content of Hill's direct testimony, apart from any previous conversations between Foy and Hill, is what affected Foy's decision to limit cross-examination. Because the present record could support either of these competing inferences, Jones has not established that Foy's conflict adversely affected his performance. This brings me to the issue of a hearing and my disagreement with the majority.

The MAR court failed to apply *Cuyler* and in the process denied Jones's request for an evidentiary hearing, which would have been

necessary for the proper application of *Cuyler*. The district court also denied Jones's request for a hearing. Jones's claim is that after Hill testified on direct that he had "walked away like he shot a dog," Foy declined to attack her credibility out of divided loyalty. Jones has established that he is entitled to an evidentiary hearing on this claim. First, he has satisfied *Townsend v. Sain*, 372 U.S. 293, 313 (1963): "the material facts were not adequately developed at the state-court hearing" because the MAR court denied Jones an evidentiary hearing. Second, although the majority disagrees, Jones has gone far enough in alleging "facts that, if true, would entitle him to relief." *Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002) (citation omitted).

The majority holds that "absent factual allegations — not mere inferences — that Hill made inconsistent statements to Foy with which he could have impeached her, Jones is not entitled to an evidentiary hearing." *Ante* at 18. In other words, an evidentiary hearing is not required when some allegations stating the claim are based on inference (or inferential facts). This, I respectfully suggest, cannot be the rule. *See* Black's Law Dictionary 629 (8th ed. 1999) (defining "inferential fact" as "[a] fact established by conclusion drawn from other evidence rather than from direct testimony or evidence; a fact derived logically from other facts"). The majority acknowledges that Foy admits in his affidavit that his pretrial conversations with Hill were the basis for his shock and surprise when he heard her testimony. The direct declarations in Foy's affidavit thus allow the further allegation, based on reasonable inference, that certain of Hill's prior statements were inconsistent with her trial testimony that Jones "walked away like he shot a dog." This allegation, if true, would show that Foy's conflict of interest had an adverse effect on his performance at trial, that is, the conflict prevented him from attacking Hill's credibility. But the majority denies a hearing because this allegation is based on an inference drawn from facts stated in Foy's affidavit. The effect of this decision is that a petitioner cannot obtain a hearing unless he already has *direct* factual support for each allegation he wishes to prove at the hearing. I am not aware of any case that supports this conclusion. In fact, courts have consistently held that when the facts available reasonably support competing inferences, a factual dispute exists and an evidentiary hearing is required to resolve it. *See, e.g.*, *Siripongs v. Calderon*, 35 F.3d 1308, 1318 (9th Cir. 1994) ("[The Petitioner] is not entitled to an evidentiary hearing merely because he

suggests a basis for bias, he must raise at least an inference of preju-
dice."); *Porter v. Wainwright*, 805 F.2d 930, 935 (11th Cir. 1986)
("[T]here are conflicting inferences that must be resolved in an evi-
dentiary hearing."). This approach makes sense because the very pur-
pose of an evidentiary hearing is to resolve factual disputes that arise
when affidavits or other proffered evidence reasonably support com-
peting conclusions.

The majority also contends that Jones is not entitled to a hearing
because he "presents only conclusory and speculative allegations as
support for his [hearing] request." *Ante* at 19. I agree that conclusory
and speculative allegations do not trigger the right to a hearing, but
Jones's allegations are not conclusory or speculative; they are sup-
ported either directly by Foy's affidavit or by reasonable inferences
that can be drawn from the affidavit. They are not at all like the
habeas petitioner's allegations in *Enoch v. Gramley*, 70 F.3d 1490
(7th Cir. 1995), a case relied on by the majority. The petitioner in
*Enoch* proffered no evidence whatsoever about how his defense law-
yer's representation of a prosecution witness in an unrelated matter
four years earlier might have adversely affected him. The court con-
cluded that an evidentiary hearing was unnecessary because the peti-
tioner had not alleged that his lawyer had "learned particular
information from his representation of [the former client] that was rel-
evant to [the petitioner's] case." *Id.* at 1497. Because Foy has already
admitted in his affidavit that Hill discussed with him "the events she
had witnessed" regarding Jones's case, J.A. 418, Jones has met
*Enoch*'s standard for an evidentiary hearing. *Enoch* therefore does not
support the denial of a hearing in this case. Moreover, *Enoch* involved
an instance of successive representation where it is more difficult to
establish a conflict than it is in the case of concurrent representation.
*Enoch*, 70 F.3d at 1496.

Even though Jones has not alleged the precise content of Hill's pre-
trial statements to Foy, Jones "has certainly put forth all someone in
his position could without the benefit of an evidentiary hearing." *Hall
v. United States*, 371 F.3d 969, 975 (7th Cir. 2004). Without a hearing
in the MAR court, Jones did not have the means to compel Foy to
reveal the details of his relevant conversations with his other client,
Hill, because North Carolina's postconviction procedure does not pro-
vide for compulsory process unless an evidentiary hearing is granted.

*See* N.C. Gen. Stat. § 15A-1411 *et seq.* In any event, the factual support Jones was able to muster for his allegations is impressive. We cannot expect Foy to have volunteered in his affidavit "that Hill's trial testimony was inconsistent with prior statements she had made to [him]" or "that Foy's representation of and concern for Hill were the reason he did not cross-examine her more rigorously." *See ante* at 17-18. (If Foy had made those statements, a hearing would not be necessary; Jones would be entitled to immediate relief on the merits.) The natural reluctance of defense trial counsel to cooperate with habeas counsel in an ineffective assistance claim is well known. Trial counsel is understandably hesitant to "help[ ] a former client publicly criticize his reputation;" indeed, a successful claim may draw the attention of the disciplinary body that polices lawyer conduct. Meredith J. Duncan, *The (So-Called) Liability of Criminal Defense Attorneys: A System in Need of Reform*, 2002 B.Y.U. L. Rev. 1, 27-28 (2002). This problem is particularly acute in *Cuyler* claims because it may be necessary to question the lawyer to determine how a particular conflict affected his representation. Often, the only way to get the full story is through an evidentiary hearing where the lawyer is subpoenaed to testify.

A lawyer's concurrent representation of a defendant and a key prosecution witness in a criminal case can present a serious conflict of interest, even though the lawyer is representing the witness in an unrelated case. If the conflict of interest adversely affects the lawyer's performance by limiting his cross-examination to avoid impeaching his witness-client, the defendant has been denied his Sixth Amendment right to counsel under *Cuyler*. When a defendant (or petitioner) like Jones has alleged such an adverse effect based on all the facts he can reasonably obtain without an evidentiary hearing, and the allegations of inferential fact cannot be resolved without examining additional evidence, he is entitled to the hearing. *See Porter*, 805 F.2d at 935. Jones has more than met this standard, and he should be granted a hearing.